## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                  No. CR 13-0969 JB

RACHEL CHAVEZ BASURTO,

      Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Sentencing Memorandum and Motion for Downward Departure, filed June 18, 2014 (Doc. 57)("Sentencing Memo."); (ii) the United States' Supplemental Briefing to the Court in Support of a Fine as Part of Defendant's Sentence, filed November 6, 2014 (Doc. 66)("U.S. Fine Memo."); and (iii) Ms. Basurto's Supplemental Brief in Opposition to Imposition of a Fine, filed March 24, 2015 (Doc. 70) ("Basurto Fine Memo."). The Court held sentencing hearings on October 7, 2014, and May 18, 2015. The primary issues are: (i) what term of imprisonment to impose upon Defendant Rachel Basurto, where there are numerous potential grounds for downward variances but also where she violated the terms of her pretrial release by committing the same criminal conduct that formed the basis of the crime of conviction in this case; and (ii) what fine to impose upon Basurto, where she owns a home jointly with her absentee husband, out of which she dealt illegal drugs, but also where she has minimal income prospects going forward, even when she is released from prison. As to the incarceration questions, the Court will treat Basurto as if her criminal history were one category less serious than the United States Sentencing Guidelines says it is, because one of the two felony convictions that ratchets up her criminal history score is about as old as a conviction

can be while still being counted under the Guidelines. The Court will not reduce Basurto's sentence on acceptance-of-responsibility grounds, because her criminal conduct on pretrial release indicates a lack of acceptance of responsibility, but it will vary downward two offense levels to reflect what her base offense level would be under an impending amendment to the drug-possession guideline. The Court will then vary the equivalent of twenty-seven months below the bottom of the working Guidelines range based on Basurto's personal characteristics, and it will impose a sentence of 51-months imprisonment. As for the fine issue, the Court will impose a fine equal to half of the estimated value of Basurto's home -- reflecting the reality that her husband jointly owns the property and that he was not involved with her drug-dealing operation -- less $2,500.00 in debt that Basurto owes to various creditors. This figure comes out to $13,133.33.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed April 28, 2014 ("PSR"), which the United States Probation Office ("USPO") prepared. The Court will first outline the facts of Basurto's offense. In compiling that section of the PSR, the USPO relied heavily on the investigative materials that the Drug Enforcement Administration ("DEA") prepared. PSR ¶ 9, at 6. The Court will then briefly describe Basurto personally, including her upbringing, her medical and mental-health situation, and her criminal history. The USPO obtained that information primarily from the presentence interview it conducted with Basurto. See PSR ¶ 49, at 13.

### 1.    The Offense of Conviction.

On March 5, 2013, DEA agents received information from the New Mexico State Police Department in reference to Basurto possibly being involved in the distribution of illegal

narcotics.  See PSR ¶ 10, at 6.  The DEA agents and state police officers visited her residence in Grants, New Mexico, to investigate their suspicions.  See PSR ¶ 10, at 6.  The DEA agents approached the front of the residence and knocked on the front door, and Basurto opened the door and agreed to speak to them.  See PSR ¶ 11, at 6.  The agents then asked if they had permission to enter her house, to which she replied "yes."  PSR ¶ 11, at 6.

Basurto stated she owned the residence and that she shared it with her daughter, Roxanne Garza, and son-in-law, Isai Bartolon-Deleon.  See PSR ¶ 11, at 6.  The agents advised her that they had reason to believe that she was involved in trafficking prescription pills and acquiring prescriptions by fraud or forgery.  See PSR ¶ 12, at 6.  They asked her if she had any prescription pills in the house that did not belong to her, and she presented them with a list of her prescribed medications and where she kept them.  See PSR ¶ 12, at 6.  The DEA agents then questioned her about whether she kept any weapons or illegal drugs in the residence, and she indicated that there were "swords and a bow and arrow," but no other weapons in the house.  PSR ¶ 12, at 6.  Basurto also indicated that there were no illegal drugs in the residence and that the only drugs in the house were her prescribed medications.  See PSR ¶ 12, at 6.  Agents asked her if she would consent to a search of the residence, and she gave verbal and written consent.  See PSR ¶ 12, at 6.

During the search, the agents found a scale, a box of small plastic baggies, and a razor blade in plain view on a desk table in Basurto's bedroom.  See PSR ¶ 13, at 6.  The agents also found a small safe and a cash-laden handbag in a false space located in the top of a closet.  See PSR ¶ 13, at 6.  At that point, the agents deployed a narcotics K-9 to search the residence.  See PSR ¶ 13, at 6.  The K-9 alerted on the small safe and on a larger safe located in Basurto's bedroom.  See PSR ¶ 13, at 6.  Basurto related that she did not have a key to the small safe and

did not know the combination to the large safe.  See PSR ¶ 14, at 6.  Basurto's daughter then opened the larger safe for the agents, revealing quantities of a white crystalline substance that field tested positive for methamphetamine, and two handbags containing cash and a Lorcin .25 caliber handgun.  See PSR ¶ 14, at 6-7.  The agents also found keys to the small safe in the larger safe.  See PSR ¶ 14, at 7.  The agents next opened the small safe, which contained $28,000.00 in cash.  See PSR ¶ 14, at 7.  The DEA agents conducted a further search of the false space in the closet, which yielded another small box containing a white crystalline substance that field tested positive for methamphetamine.  See PSR ¶ 15, at 7.  The agents also discovered, wrapped in a blanket in the closet, a brown substance that field tested positive for heroin.  See PSR ¶ 15, at 7. The agents placed Basurto under arrest and terminated the search.  See PSR ¶ 15, at 7.

According to DEA laboratory reports, a total of 11.5 grams of methamphetamine and 94.1 grams of heroin were recovered from Basurto's residence.  See PSR ¶ 16, at 7.  The DEA case agent assigned to the case states that Basurto appears to have been a source and supplier of heroin, methamphetamine, and oxycodone in the Grants area.  See PSR ¶ 17, at 7.  The case agent states that he believes that Basurto played a significant role in the distribution of illegal narcotics.  See PSR ¶ 17, at 7.  The case agent opines that the amounts of illegal substances and money -- as well as the presence of the firearm -- in her residence are "not indicative of someone who is a low-level street dealer."  PSR ¶ 17, at 7.  According to the case agent and the Assistant United States Attorney assigned to the case, Basurto did not provide a post-arrest statement, and she has not yet been debriefed.  See PSR ¶ 17, at 7.  The case agent states, however, that there is no evidence that the firearm located in the residence was stolen or that it has ever been involved in a crime.  See PSR ¶ 17, at 7.

In addition to the crime of indictment, in March, 2014, while on pretrial release, Basurto sold 1.1 grams of heroin to confidential law enforcement sources.  See PSR ¶ 19, at 7.  The USPO opines that, under U.S.S.G. § 1B 1.3 (Relevant Conduct), Basurto's March, 2014 conduct is part of the same course of conduct as the counts of conviction and that she is thus on the hook for the additional 1.1 grams of heroin.  See PSR ¶ 19, at 7.

### 2.      Basurto's Personal Characteristics and Criminal History.

The Court will describe the USPO's relevant findings about Basurto's background.  The Court will describe her (i) upbringing; (ii) mental and physical health and substance-abuse history; (iii) financial condition; and (iv) relevant criminal history.

#### a.      Upbringing and Family Information.

Basurto was born on February 23, 1961, in Grants; she is, thus, currently fifty-four years old.  See PSR ¶ 50, at 13.  She does not know who her biological father is and has no contact with him.  See PSR ¶ 50, at 13.  Her mother, who is currently seventy-three years old, married William Salcido, who is currently seventy-one years old, when she was young; Salcido raised Basurto, and Basurto considers him to be her father.  See PSR ¶ 50, at 13.  Salcido and her mother are both disabled, and they presently live together in San Rafael, New Mexico.  See PSR ¶ 50, at 13.  Salcido suffers from depression, heart problems, and high blood pressure, and he has a pacemaker.  See PSR ¶ 50, at 13.  He is ex-military and was a miner.  See PSR ¶ 50, at 13.  Basurto's mother suffers from diabetes, high blood pressure and severe joint pain, and she is expecting to undergo knee and hip replacement surgery.  See PSR ¶ 50, at 13.  Basurto helps care for both of her parents, and they require twenty-four-hour in-home nurse care.  See PSR ¶ 50, at 13.

Basurto has a positive and close relationship with her parents.  <u>See</u> PSR ¶ 50, at 13.  Her parents are aware of her current situation, and they are worried that they will not be alive to see her upon her release.  <u>See</u> PSR ¶ 50, at 13.  Basurto indicates that her parents have no history of substance abuse or criminal conduct.  <u>See</u> PSR ¶ 50, at 13.  Basurto has three half-siblings, with two of whom Basurto has close relationships.  <u>See</u> PSR ¶¶ 51-52, at 13-14.

Basurto describes her childhood as "hard," because she had to care for her maternal grandmother and her siblings.  PSR ¶ 53, at 14.  She says was never the victim of any physical or sexual abuse, and states that her parents worked very hard to provide for her and her siblings.  <u>See</u> PSR ¶ 53, at 14.  She adds that, at an early age, she began to work so that she could buy her own things.  <u>See</u> PSR ¶ 53, at 14.  She did not graduate from high school, but she obtained her G.E.D. in 1992 while incarcerated.  <u>See</u> PSR ¶ 67, at 17.  She has held down jobs in the past -- as a restaurant server, call-center employee, bartender, housekeeper, and landscaper -- but she has not worked since 2003.  <u>See</u> PSR ¶¶ 68-72, at 17-18.  When asked what her plan is during or after her service of sentence regarding the instant offense, she stated: "'I plan to take care of my parents and family.  That's all I live for.'"  PSR ¶ 55, at 14 (quoting Basurto).

Basurto is currently either single or in the final stages of divorcing her most recent husband, Melchore Basurto.  <u>See</u> PSR ¶ 56, at 14; <u>id.</u> ¶ 58, at 15.  She was previously married to Raul Garza, who is currently fifty-four years old.  <u>See</u> PSR ¶ 56, at 14.  She married Garza in 1976, and they divorced in 1991.  <u>See</u> PSR ¶ 56, at 14.  She asserts that the divorce was the result of marital problems that his severe substance abuse issues cause, and that her ex-husband ultimately passed those issues on to her.  <u>See</u> PSR ¶ 56, at 14; <u>id.</u> ¶ 64, at 16.  Garza is currently incarcerated in Hobbs, New Mexico, on drug charges, and Basurto has no contact with him.  <u>See</u>

PSR ¶ 56, at 14.  She had three children with Garza -- all daughters -- and she states that she has "a close and positive relationship" with all of them.  PSR ¶ 57, at 15.  See PSR ¶ 56, at 14.

### b.   Mental and Physical Health and Substance-Abuse History.

Basurto has numerous health problems.  She contracted hepatitis C in 1994 as a result of intravenous needle use, and she was diagnosed with diabetes in 2003.  See PSR ¶ 59, at 15.  She has also been diagnosed with epilepsy, depression, rheumatoid arthritis, cirrhosis of the liver, migraines, hypertension, vascular disease, hepatic encephalopathy, fibromyalgia, and acid-reflux disease.  See PSR ¶ 60, at 15-16; id. ¶ 62, at 16.  In 2004, she fell off a chair and hit her head, causing severe bleeding in her brain.  See PSR ¶ 59, at 15.  As a result, she suffers from seizures, which occur approximately four to five times per week.  See PSR ¶ 59, at 15.  She also suffers from severe back, knee, and ankle pain, which renders her unable to work.  See PSR ¶ 59, at 15.

Basurto reports that heroin is her drug of choice and that it "is the cause for all her problems."  PSR ¶ 64, at 16.  She states that she started using approximately in 1985, at age twenty-four, and that she last used it on April 16, 1998.  See PSR ¶ 64, at 16.  She says that her first husband was a heroin addict and that she began using because she was "curious" as to how it felt to use heroin.  PSR ¶ 64, at 16.  She ultimately began using approximately $200.00 to $300.00 worth of heroin on a daily basis.  See PSR ¶ 64, at 16.  She took the drugs via injections, and, although she never overdosed, she contracted hepatitis C from using a tainted needle.  See PSR ¶ 64, at 16.  In the early 1990s, she admitted herself into a ninety-day substance-abuse rehabilitation program in Silver City, New Mexico, but she was kicked out of the program after two weeks for smuggling in illegal drugs.  See PSR ¶ 65, at 16.  She also previously attended Narcotics Anonymous meetings, but she stopped as a result of the negative influences in the program.  See PSR ¶ 65, at 16-17.  In 1998, while incarcerated at the Women's Prison in Grants,

she participated in the Therapeutic Community Unit and completed its substance-abuse program. See PSR ¶ 65, at 17.  She reports that she has been drug free since she was released from prison in 2000, and she feels that she would not benefit from more substance-abuse treatment at this point.  See PSR ¶ 65, at 17.  On March 14, 2013, the New Awakenings Counseling Agency in Albuquerque, New Mexico assessed her, and, according to its assessment, she does not meet the diagnostic criteria for mental-health or substance-abuse treatment.  See PSR ¶ 66, at 17.

### c.      <u>Financial Condition</u>.

The USPO reports that Basurto owns a residence worth $102,356.00 and has $2,501.00 in liabilities, making her net worth $99,855.00.  See PSR ¶ 74, at 19.  The PSR also states that she has $725.00 in monthly income, all of it from disability payments, and $1,501.00 in monthly expenses, making for a negative monthly cash flow of $776.00.  See PSR ¶ 74, at 19.

### d.      <u>Relevant Criminal History</u>.

Basurto has numerous prior convictions, but the USPO contends that only three of them contribute to her criminal history score under the Guidelines, because the others[1] are outside of the Guidelines' temporal look-back windows, see U.S.S.G. § 4A1.2(e)(1)-(2), and thus stale, see PSR ¶¶ 35-38, at 9-11.  First, on May 11, 1998, she was convicted in New Mexico state court of forgery and possession of a stolen credit card, and sentenced to three-and-a-half years of incarceration, two years of which was suspended.  See PSR ¶ 39, at 11.  The USPO says that this conviction counts for 3 criminal history points.  See PSR ¶ 39, at 11.  Second, on July 16, 1998, she was convicted, again in New Mexico state court, of receiving or disposing of stolen property

---

[1]Basurto has four stale convictions: (i) a May 6, 1988, misdemeanor conviction for altering tags, see PSR ¶ 35, at 9; (ii) a January 20, 1989, felony conviction for fraudulent use of a credit card, see PSR ¶ 36, at 9; (iii) a January 3, 1992, conviction for failure to appear in court, see PSR ¶ 37, at 10; and (iv) a September 2, 1992, felony conviction for forgery, see PSR ¶ 38, at 10.

over $250.00, for which the court sentenced her to thirty months imprisonment and one year of parole.  See PSR ¶ 40, at 11.  The USPO says that this conviction also counts for 3 criminal history points.  See PSR ¶ 40, at 11.  Finally, on January 4, 2013, she was convicted in Arizona state court of shoplifting, for which the court fined her $480.00.  See PSR ¶ 41, at 11-12.  The USPO says that this conviction imparts 1 criminal history point, thus bringing her total to 7, which indicates a criminal history category of IV.  See PSR ¶¶ 41-43, at 11-12.

## PROCEDURAL BACKGROUND

Basurto pled guilty, without a plea agreement, on March 27, 2013, to two counts: (i) Count I, possession with intent to distribute heroin under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and (ii) Count II, possession with intent to distribute a methamphetamine-containing mixture, also under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  See Plea Minute Sheet, filed March 4, 2014 (Doc. 47); PSR ¶¶ 1, 3, at 5.  This case involves both incarceration and monetary sanctions against Basurto.  As to imprisonment, the USPO states that Basurto's base offense level under the Guidelines, based on the amounts of heroin and methamphetamine she possessed, should be 26, see PSR ¶ 24, at 8 (citing U.S.S.G. § 2D1.1), and it additionally applied a 2-level enhancement for possessing a dangerous weapon, see PSR ¶ 25, at 8 (citing U.S.S.G. § 2D1.1(b)(1)), resulting in a total offense level of 28, see PSR ¶ 29, at 8, which, when combined with her criminal history category of IV, result in a Guidelines imprisonment range of 110 to 137 months, see PSR ¶ 76, at 19.  The USPO does not recommend a reduction for acceptance of responsibility, because Basurto "continued to engage in criminal conduct, by selling heroin on two occasions."  PSR ¶ 31, at 9.  It states that, "[a]lthough [she] pled guilty in this matter and initially accepted responsibility, her conduct since the guilty plea is not indicative of someone who has truly accepted responsibility for their offense."  PSR ¶ 31, at 9.  Earlier in the PSR,

however -- perhaps added before Basurto's crime while on pretrial release and kept in the PSR as an oversight -- the USPO states that Basurto "provided a factual basis for her guilty plea at the change of plea hearing; therefore, an adjustment for acceptance of responsibility will be made." PSR ¶ 22, at 7-8.

As for monetary sanctions, the USPO states that Basurto faces mandatory special assessments of $100.00 apiece for both of her two counts of conviction.  See PSR ¶ 86, at 20.  It also states that she faces discretionary fines on both counts and that the statutory maximum for each is $1,000,000.00.  See PSR ¶ 85, at 20 (citing 21 U.S.C. § 841(b)(1)(C)).  It says that the Guidelines indicate a total fine range -- for both Counts combined -- of $12,500.00 to $2,000,000.00.  See PSR ¶ 87, at 20 (citing U.S.S.G. § 5E1.2(c)(4)).  The USPO also states that, while Basurto does not owe restitution in this case, as there is no private victim, see PSR ¶¶ 89-90, at 21 (citing 18 U.S.C. § 3663), she owes the United States the costs of its prosecution, which the USPO calculates to be $2,412.33 per month while she is in Bureau of Prisons ("BOP") facilities, $2,244.17 per month while she is in community correction centers, and $278.95 per month while she is on supervised release, see PSR ¶ 88, at 21 (citing 18 U.S.C. § 3572(a)(6); U.S.S.G. § 5E1.2(d)(7)).  The USPO caveats its fine recommendations, however, by noting that, "[b]ased on available information, it appears the defendant does not have the ability to pay a fine."  PSR ¶ 74, at 18.

### 1.     The Briefing on the Proper Term of Imprisonment.

Shortly after the PSR's issuance, Basurto lodged two objections with the USPO.  See Addendum to the Presentence Report, disclosed June 25, 2014 ("Addendum").  The USPO appears to acknowledge the validity of -- if not fully agree with -- both of these objections.  See Addendum at 1-2.   First, Basurto contends that her criminal history category of IV

over-represents her criminal history and that "a criminal history category of I is more representative of" her history. Addendum at 1. The USPO concedes that a category of IV over-represents her criminal history but contends that a reduction to III is all that is needed to rectify the over-representation. See Addendum at 1. Basurto and the USPO base their conclusions that her criminal history is over-represented on the fact that she "has [only] two prior convictions, both of which are non-violent offenses and occurred 15 years ago." Addendum at 1. Second, Basurto contends that the Court should grant her a downward variance based on her precarious medical and mental health conditions, substance abuse issues, and personal history. See Addendum at 1. Variances are, of course, outside of the Guidelines framework, and the USPO's response to Basurto's objection was to neither recommend for or against a variance, but the USPO stated that it had identified those factors in paragraphs 94-95 of the PSR and that it "agrees a downward variance outside the advisory guideline range may be warranted in this case." Addendum at 2.

Basurto submitted the Sentencing Memo. on June 18, 2014. The Sentencing Memo. makes five arguments. First, Basurto contends that she deserves the full 3-level reduction for acceptance of responsibility. See Sentencing Memo. at 2-3. She states that, although her conduct on pretrial release "does not demonstrate a profound withdrawal from criminal conduct or associations," the USPO's position that this conduct should deprive her of the adjustment "ignores the penalty that Ms. Basurto has already paid" -- meaning, presumably, that the addition of those additional pretrial-release drug quantities to the drug quantities involved in her crime of conviction for the purposes of determining her base offense level adequately reflects the

seriousness of her conduct on pretrial release.[2]  Sentencing Memo. at 3.  She additionally points out -- much more persuasively, <u>see</u> <u>supra</u> note 2 -- that, if she had been separately convicted of her pretrial-release crime, her Guidelines range for that crime would be 15 to 21 months; by losing her acceptance-of-responsibility adjustment, however, her Guidelines range rises from seventy-seven to ninety-six months to 110 to 137 months.  <u>See</u> Sentencing Memo. at 3.

Second, Basurto argues that a criminal history category of IV over-represents her criminal history.  She notes that her two felony convictions "are as old as they could be and still qualify for criminal history points," with one of them set to go stale a mere two months after Basurto committed the instant offense.  Sentencing Memo. at 5.  She also points out that, "during the intervening 15 years between the commission of her 1997 and 1998 crimes and the instant offense[,] . . . Ms. Basurto only suffered one misdemeanor conviction and no other interface with the criminal law."  Sentencing Memo. at 5.  She argues that the Court should count only the misdemeanor conviction, leaving her with a criminal history category of I.  <u>See</u> Sentencing Memo. at 9.

Third, Basurto argues that her medical condition "is exceedingly precarious and merits a variance."  Sentencing Memo. at 6.  She states that her life expectancy is "maybe 20 to 25 years," and thus "a sentence of 110 months is virtually half her remaining life."  Sentencing Memo. at 7.  She also asserts that she is not receiving all of her prescribed medications in prison, especially the narcotic-based medications.  <u>See</u> Sentencing Memo. at 7.  Last, she asserts that her conditions are incurable and that they will only worsen with time, and that, thus, "her

---

[2]The USPO notes, however, that "the relatively small amount of heroin" -- 1.1 grams -- that Basurto sold while on pretrial release "does not impact the base offense level."  PSR ¶ 24, at 8.

incarceration will be more difficult than a similarly situated inmate without her constellation of medical problems." Sentencing Memo. at 7.

Fourth, she points out that a proposed amendment the Guidelines will, if passed, indicate a base offense level 2 levels lower than the one currently indicated -- 24, rather than 26. <u>See</u> Sentencing Memo. at 8. Basurto asserts that "[p]assage appears likely" and that, if passed, the new provision would be retroactive. Sentencing Memo. at 8.

Fifth and finally, Basurto asks for a variance on the basis of her family situation. <u>See</u> Sentencing Memo. at 9. She asserts that she cares for her parents and is the mother of three adult daughters and grandmother of five grandchildren. <u>See</u> Sentencing Memo. at 9. Basurto notes that, if the Court grants both her requested offense-level reduction from 28 to 26 on the basis of the impending amendment and her requested criminal history category reduction from IV to I, her Guidelines range changes to 51-63 months. <u>See</u> Sentencing Memo. at 9. She then asks the Court to vary below the low end of that range and to impose a sentence of 51 months or less. <u>See</u> Sentencing Memo. at 9.

The United States responded to the Sentencing Memo. two weeks later. <u>See</u> United States' Response to Defendant's Sentencing Memorandum and Motion for Downward Departure Filed on June 18, 2014 (Doc. 57), filed July 2, 2014 (Doc. 60)("Response"). The United States argues not only that a variance below the bottom of the Guidelines range is inappropriate, but that "a sentence below the <u>high-end</u> of the applicable guideline range would not be appropriate in this case." Response at 5 (emphasis added). The Response mostly reiterates the facts of the offense and Basurto's criminal activity on pretrial release. It points out that she lied to investigators about there being illegal drugs and weapons in her home, <u>see</u> Response at 5, and that the amounts of drugs found in the house -- and the firearm's presence -- indicate that she

was more than a street-level dealer, see Response at 6-9.  The United States opposes a variance

on medical grounds, noting:

> From December 25, 2011, there have been four emergency calls to Defendant's
> house, three for non-medical related reasons, which include someone not picking
> up her child, possible "drug activity" occurring around Defendant's house, and
> someone kicking a puppy.  For the past three to four years, there has been only
> one medical emergency call, which occurred on April 11, 2014, the day the search
> warrant was executed on Defendant's house after she sold heroin to a confidential
> source in March 2014 as stated above.  Defendant has also had another "epileptic
> episode" while she was in the courtroom for the instant offense.  The United
> States is troubled by Defendant's frequent use of her "medical conditions" when
> requesting for leniency and for release from custody.   Furthermore, while
> Defendant claims her medical conditions warrant a downward variance, she
> wasn't so ill or immobile when she was trafficking heroin and methamphetamine
> on three separate occasions . . . .

Response at 9-10.

The United States consents, however, to one of Basurto's requests in full and to another

in part.  The United States is amenable to a 2-level downward variance on the basis of the

impending Guidelines amendment, see Response at 12, and, while it disagrees that the Court

should sentence Basurto under a criminal history category of I, it agrees with the USPO's

recommended reduction of her criminal history category from IV to III, see Response at 12-13.

The United States opposes an acceptance-of-responsibility reduction for essentially the same

reasons that the USPO recommends against it.  See Response at 14.

### 2.      The First Sentencing Hearing, and Resolving the Term of Imprisonment.

The Court held a sentencing hearing on October 7, 2014.  See Transcript of Hearing, filed

November 14, 2014 (Doc. 67)(taken Oct. 7, 2014)("1st Tr.").  At the hearing, Basurto withdrew

her objection to the PSR's refusal to grant her a reduction for acceptance of responsibility.  See

1st Tr. at 3:5-4:25 (Winterbottom, Court).  Basurto thus agreed that, under the Guidelines, her

ultimate offense level is 28 and her criminal history category is IV.  See 1st Tr. at 5:4-9 (Court,

Winterbottom).  The Court stated that it would grant the requested 2-level downward variance based on the impending amendment, see 1st Tr. at 5:10-20 (Court), and would also go along with the United States' and USPO's recommended criminal history category of III, see 1st Tr. at 19:22-21 (Court), leaving the Court with a "working" offense level of 26 and criminal history category of III, producing a working sentencing range of 78-97 months, 1st Tr. at 20:21-24 (Court).  The Court declined to grant Basurto's requests to treat her criminal history category as I, however, noting that she has a number of unconvicted arrests and stale convictions, none of which count toward her Guidelines criminal history; the Court also noted that her criminal conduct while on pretrial release bodes poorly for the "likelihood that she w[ill not] commit further crimes."  1st Tr. at 19:25-20:19 (Court).

Basurto reiterated her variance arguments, see 1st Tr. at 24:10-32:9 (Winterbottom), and additionally asked that the Court recommend to the BOP that she serve her sentence at Federal Medical Center Carswell, see 1st Tr. at 32:10-13 (Winterbottom).  The Court then announced its sentence, applying the § 3553(a) factors to its working Guidelines range.  The Court concluded that several factors combined to put about fourteen levels of downward pressure on Basurto's Guidelines range, including: (i) her ability to overcome somewhat her harsh childhood and previous addiction, see 1st Tr. at 43:18-21 (Court); (ii) her relatively sparse recent criminal history, see 1st Tr. at 43:21-44:3 (Court); (iii) her medical problems, see 1st Tr. at 44:4-17 (Court); (iv) that her crime of conviction was non-violent and that she has no history of violence, see 1st Tr. at 44:18-45:7 (Court); and (v) the availability and moderate likelihood of success of supervised release, see 1st Tr. at 45:8-13 (Court).  The Court also concluded that there were several factors that combined to place about nine levels of upward pressure on the sentence, including: (i) the seriousness of the crime, see 1st Tr. at 46:4-5 (Court); (ii) her performance on

pretrial release, see 1st Tr. at 46:6-7 (Court); (iii) the need for specific and general deterrence, see 1st Tr. at 46:10-12 (Court); (iv) the need to protect the public, see 1st Tr. at 46:12 (Court); (v) the need to avoid unwarranted sentence disparities among similarly situated defendants, see 1st Tr. at 46:13-15 (Court); and (vi) the Court's lack of confidence that Basurto will succeed on supervised release, see 1st Tr. at 46:18-20 (Court).   The Court then varied downward and imposed a sentence of 51-months imprisonment.  See 1st Tr. at 47:14-24 (Court).  The Court also imposed three years of supervised release to follow the term of incarceration.  See 1st Tr. at 50:10-12 (Court).

The Court also imposed two $100.00 special assessments, see 1st Tr. at 51:21-23 (Court), and stated that it was inclined to impose a hefty fine on top of those:

> Based on the defendant's financial resources, the Court will impose a fine of $99,655.  She has resources, and it seems like the house was used as a house which drugs were dealt out of.  It seems the residents knew that was taking place. It's going to cost the Government considerably more than that to incarcerate her and to supervise her for the next seven years.

1st Tr. at 51:13-20 (Court).  The parties requested that the Court delay the imposition of sentence so that they could develop more information on the value of Basurto's residence, and the Court agreed.  See 1st Tr. at 51:52-17 (Wang, Court, Winterbottom).

### 3.      The Briefing on the Fine.

The United States filed the U.S. Fine Memo. a month after the hearing.  In it, the United States supported the Court's proposed $99,655.00 fine.  See U.S. Fine Memo. at 1.  It states that Basurto's home is worth $102,356.00 and that it is unencumbered by any liens.  See U.S. Fine Memo. at 3.  It also points out that over $30,000.00 in cash was seized from her home.  See U.S. Fine Memo. at 5.  The United States says that it

> was able to obtain the deed to Defendant's house, and at the time of purchase in 2004, the deed listed the residence at the sale price of $40,000.00 to both Melchor

Basurto and Defendant, as husband and wife.  The sale of this property in 2004 and the assessment of this real estate property for purposes of assessing property taxes in Grants County, New Mexico is substantially under the fair market value as stated by Defendant and the Experian Credit report verification.  It is the United States' position that Defendant would be in the best position to know the fair market value of her home, and that the value of the residence is at $102,356.00, without any liens.

U.S. Fine Memo. at 5-6 (citations omitted).  Despite the United States' representations about the house's value, it attaches two documents which would seem to undermine that valuation: (i) the contract of sale, showing that when Basurto and her husband bought the house in 2004, they paid only $40,000.00 for it; and (ii) a Cibola County tax assessment from 2014 valuing the house and land together at a total of $33,689.00.[3]   See Home Valuation Documents, at 1-2, 7, filed November 6, 2014 (Doc. 66-4).

The United States supplemented its U.S. Fine Memo. several months later, but before Basurto submitted anything on the subject of the fine.  See United States' Supplement to Its Briefing to the Court in Support of a Fine as Part of Defendant's Sentence Filed on November 6, 2014 (Doc. 66), filed March 3, 2015 (Doc. 69)("Supplement").  The United States stands by its requested fine, but notes that Basurto has contested the administrative seizure of the cash from her home, and that the DEA, although finding that Basurto had put forth an "insufficient showing that the currency was not being used to facilitate drug distribution activities," had remitted

---

[3]In New Mexico, tax-assessment value is one-third of actual value.  See N.M. Const. art. III, § 1 ("Different methods may be provided by law to determine value of different kinds of property, but the percentage of value against which tax rates are assessed shall not exceed thirty-three and one-third percent.").  It is interesting -- and apparently coincidental -- that the $102,356.00 valuation that Basurto initially gave to the USPO is almost exactly three times the tax-assessment's value.  The Court would be inclined to think that the tax assessment's figure refers to the taxable value, rather than the actual value, except that the assessment specifically notes that the $33,689.00 figure is the property's "actual" value, and it gives a figure one-third that size, $11,230.00, as the property's "assessed" or "taxable" value.

$13,628.50 of that money back to Basurto, reasoning that this remittance "was warranted to avoid extreme hardship."  Supplement at 2.

Basurto filed the Basurto Fine Memo. three weeks after the United States filed the Supplement.  Basurto contests the fine on five broad grounds.  First, she contends that she "cannot under New Mexico law sell the humble home she and her husband bought and paid for with legitimate funds," Basurto Fine Memo. at 1, because her husband's joint ownership of the home precludes sale, Basurto Fine Memo. at 3 ("Ms. Basurto does not believe her husband would agree to sell their house.  Ms. Basurto does not know where Mr. Basurto is, but he has been in contact with at least one of her daughters.").  Second, she asserts that the home is worth only a fraction of the value to which the United States and the USPO attributes it, providing documentation that "[t]he Cibola County Assessor assessed Ms. Basurto's home to be worth $33,689 in 2014."  Basurto Fine Memo. at 3 (citing Search and Seizure Warrant, filed November 6, 2014 (Doc. 66-3)).  Third, she contends that such a high fine would violate the Excessive Fines Clause, U.S. Const. amend VIII, because it would dispossess her of her home and result in her family's eviction, and because her home had only a limited connection to the crimes at issue. See Basurto Fine Memo. at 15-17.  Fourth, she contends that, under the factors outlined in 18 U.S.C. § 3553(a), § 3572(a), and U.S.S.G. § 5E1.2(d), such a high fine is inappropriate and would constitute an abuse of discretion.  See Basurto Fine Memo. at 9-10.  Fifth and finally, she asserts that, even if the Court were to force the sale of Basurto's home, her share of the proceeds would amount to less than half of the proposed $99,655.00 fine.  See Basurto Fine Memo. at 24-25.

4.        <u>The Second Sentencing Hearing, and Resolving the Fine</u>.

The Court held a second sentencing hearing on May 18, 2015, picking up where it left off in the prior hearing.  <u>See</u> Transcript of Hearing (taken May 18, 2015)("2nd Tr.").[4]  The Court opened by stating that, on account of Basurto's evidence-backed assertions that her house is worth much less than the PSR said it is, the Court was inclined to reduce its fine to $15,634.33 -- reflecting the tax assessment's valuation of $33,689.00, less the $200.00 in special assessments and a six-percent realtor's fee, which she will likely sustain if she has to sell the home.  <u>See</u> 2nd Tr. at 2:13-3:5 (Court).  Basurto stated that she opposed even this much-smaller figure, because, "even assuming the house is worth $30,000[,] the purpose of a fine is to punish, not to destroy," and the fine would still necessitate Basurto selling her home.  2nd Tr. at 3:25-4:5 (Butcher). Basurto's arguments against the fine at the hearing were primary practical ones; she contended that a five-figure fine would force her into poverty and alluded to the possibility that it might nudge her into further profit-bearing criminal activity that she might not otherwise commit. After hearing these arguments, the Court lowered its figure even further and imposed a fine of $13,133.33, with the $2,500.00 reduction designed to compensate for some of Basurto's other liabilities to creditors.  <u>See</u> 2nd Tr. at 27:7-14 (Court).  The Court noted that this figure is "a little over $600 above the minimum guideline range."  2nd Tr. at 27:14-15 (Court).

This second hearing concluded the case.  The Court sentenced Basurto to 51-months imprisonment to be followed by 3 years of supervised release, a $13,133.33 fine, and $200.00 in special assessments.  <u>See</u> Sentencing Minute Sheet at 1, filed May 18, 2015 (Doc. 73).

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

## LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court severed the mandatory provisions from the Federal Sentencing Act, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> **(A)**    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> **(B)**    to afford adequate deterrence to criminal conduct;
>
> **(C)**    to protect the public from further crimes of the defendant; and
>
> **(D)**    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit

similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate.");  United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any

presumption in favor of the advisory guideline sentence. See Rita v. United States, 551 U.S.

at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

      While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb.

13, 2008)(Browning, J.).

## LAW REGARDING THE IMPOSITION OF CRIMINAL FINES

      There is a three-tier hierarchy of authority to which a district court must look when

imposing a criminal fine. At the top of the hierarchy, as always, is the Constitution of the United

States of America. The Eighth Amendment to the Constitution contains an Excessive Fines

Clause, to which the appellate courts have given content over the years.[5] See U.S. Const. amend

---

[5]The right to be free from excessive fines is one of the few remaining rights that the Supreme Court has not incorporated against the states. When the Bill of Rights was adopted, none of the rights within it applied against state governments. See Barron v. Baltimore, 32 U.S. (7 Pet.) 243, 250 (1833)(Marshall, C.J.)(holding that the first ten "amendments contain no expression indicating an intention to apply them to the State governments," and that, thus, "[t]his court cannot so apply them"). Cf. U.S. Const. amend I ("Congress shall make no law respecting an establishment of religion . . . ." (emphasis added)). After the post-Civil War passage of the Fourteenth Amendment to the Constitution, however, the Supreme Court of the United States began using that Amendment's Due Process Clause, see U.S. Const. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." (emphasis added)), to "incorporate" the various individual liberties contained in the Bill of Rights against the states, e.g., McDonald v. City of Chicago, 561 U.S. 742, 752 (2010)(Alito, J.).
      The Supreme Court did not incorporate the entire Bill of Rights in one fell swoop, however, but instead relied on a piecemeal process of "selective incorporation" -- basically, incorporating rights against the states one at a time, as the opportunities to do so arose. McDonald v. City of Chicago, 561 U.S. at 752. The standard for whether a Bill of Rights provision should be incorporated is whether the right is "implicit in the concept of ordered liberty," and "so rooted in the traditions and conscience of our people as to be ranked as

fundamental." McDonald v. City of Chicago, Ill., 561 U.S. at 760. See Washington v. Glucksberg, 521 U.S. 702, 721 (1997); Duncan v. Louisiana, 391 U.S. 145, 149 (1968); Palko v. Connecticut, 302 U.S. 319, 325 (1937). To date, the Supreme Court has incorporated almost all of the Bill of Rights' provisions, including: the First Amendment to the Constitution's Free Speech Clause, see Gitlow v. New York, 268 U.S. 652 (1925), its Free Exercise Clause, see Cantwell v. Connecticut, 310 U.S. 296 (1940), its Establishment Clause, see Everson v. Bd. of Educ., 330 U.S. 1 (1947), and its guarantees of freedom of the press, see Near v. Minnesota, 283 U.S. 697 (1931), freedom of assembly, see DeJonge v. Oregon, 299 U.S. 353 (1937), and the right to petition the government for redress of grievances, see Edwards v. South Carolina, 372 U.S. 229 (1963); the Second Amendment to the Constitution's right to bear arms, see McDonald v. City of Chicago, 561 U.S. at 742; the Fourth Amendment to the Constitution's right against unreasonable search and seizure, see Wolf v. Colorado, 338 U.S. 25 (1949), its Warrant Clause, see Aguilar v. Texas, 378 U.S. 108 (1964), and even, to some extent, its remedial gloss, the exclusionary rule, see Mapp v. Ohio, 367 U.S. 643 (1961); the Fifth Amendment to the Constitution's privilege against self-incrimination, see Miranda v. Arizona, 348 U.S. 436 (1966)(creating new anti-self-incrimination rights and immediately applying them against the states); Griffin v. California, 380 U.S. 609 (1965)(applying pre-established anti-self-incrimination rights against the states), its Double Jeopardy Clause, see Benton v. Maryland, 395 U.S. 784 (1969), and Takings Clause, see Chi., Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226 (1897); the Sixth Amendment to the Constitution's rights to a public trial, see In re Oliver, 333 U.S. 257 (1948), to assistance of counsel, see Gideon v. Wainwright, 372 U.S. 335 (1963), to trial by jury, see Duncan v. Louisiana, 391 U.S. 145 (1968), and to compulsory process, see Washington v. Texas, 388 U.S. 14 (1967), and its Speedy Trial Clause, see Klopfer v. North Carolina, 386 U.S. 213 (1967), and Confrontation Clause, see Pointer v. Texas, 380 U.S. 400 (1965); and the Eighth Amendment's Cruel and Unusual Punishments Clause, see Robinson v. California, 370 U.S. 660 (1962), and Excessive Bail Clause, see Schilb v. Kuebel, 404 U.S. 357 (1971).

What remains is a collection of six rights -- the also-rans of the Bill of Rights -- which have either not been incorporated or whose incorporation status is unclear. First, the Third Amendment to the Constitution's right to be free from quartering of soldiers in private homes, unsurprisingly, does not come up much. The United States Court of Appeals for the Second Circuit has held that the Third Amendment is incorporated, and the United States Court of Appeals for the Tenth Circuit has suggested that it is, but the Supreme Court has not addressed the issue. See United States v. Nichols, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988); Engblom v. Carey, 677 F.2d 957 (2d Cir. 1982). Second, the Supreme Court has expressly held that the Fifth Amendment's right to indictment by grand jury does not apply against the states. See Hurtado v. California, 110 U.S. 516 (1884). (A topic for another day, the institution of the grand jury has decayed from its standing at the Founding as a meaningful shield from unjust prosecution to its modern status as an investigatory sword for prosecutors. It is not the worst thing in the world that the right was not incorporated.) Third, the Sixth Amendment's Vicinage Clause does not appear to have been incorporated, although neither the Supreme Court nor the Tenth Circuit has commented on the subject. See Caudill v. Scott, 857 F.2d 344 (6th Cir. 1988); Cook v. Morrill, 783 F.2d 593 (5th Cir. 1986); Zicarelli v. Dietz, 633 F.2d 312 (3d Cir. 1980). Fourth, the Supreme Court has held that the Constitution imposes two conditions on federal criminal juries that it does not impose on their state counterparts: that they contain twelve jurors and that their

verdicts be unanimous.  See Williams v. Florida, 399 U.S. 78 (1970).  These unincorporated "rights" are unique, in that they have no basis in the Sixth Amendment's text; the Supreme Court simply read a penumbra onto the Amendment's use of "trial[] by . . . jury," which it applies against the federal government but not against the states.  U.S. Const. amend. VI.  Fifth, and probably the most important unincorporated right, the Seventh Amendment to the Constitution's right to a civil jury trial -- and its right against re-examination of a jury verdict, although that right has little meaning without a broader jury-trial right -- does not apply against the states.  See Minneapolis & St. Louis R.R. Co. v. Bombolis, 241 U.S. 211 (1916).  Sixth and finally, "[t]here is a surprising amount of confusion as to whether the Excessive Fines Clause has been incorporated."  Reyes v. N. Tex. Tollway Auth., 830 F. Supp. 2d 194, 206 (N.D. Tex. 2011).

In Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257 (1989)("Browning-Ferris"), the Supreme Court held that the Excessive Fines Clause does not place limits on punitive damages in suits between private parties.  See 492 U.S. at 260.  The Supreme Court did not address incorporation, but the Honorable Sandra Day O'Connor, then-Associate Justice of the Supreme Court, did.  The case involved a diversity suit and, while the majority saw no reason to delve into the incorporation issue -- the trial, after all, occurred in federal court -- Justice O'Connor apparently felt that, because Vermont state law had supplied the substantive law giving rise to the punitive damages, the incorporation issue was a threshold question.  See Browning-Ferris, 492 U.S. at 276 n.22 (majority opinion)("Because of the result we reach today, we need not answer several questions that otherwise might be necessarily antecedent . . . .  We shall not decide whether the Eighth Amendment's prohibition on excessive fines applies to the several States through the Fourteenth Amendment, nor shall we decide whether the Eighth Amendment protects corporations as well as individuals.").  Justice O'Connor did not perform much in the way of analysis, but she made her position on the issue clear:

> Since Robinson, the Cruel and Unusual Punishments Clause has been regularly applied to the States, most notably in the capital sentencing context.  In addition, the Court has assumed that the Excessive Bail Clause of the Eighth Amendment applies to the States.  I see no reason to distinguish one Clause of the Eighth Amendment from another for purposes of incorporation, and would hold that the Excessive Fines Clause also applies to the States.

Browning-Ferris, 492 U.S. at 284 (O'Connor, J., concurring in part and dissenting in part, joined by Stevens, J.)(citation omitted).  Before Browning-Ferris, apparently no court -- either federal or state -- had addressed whether the Excessive Fines Clause is incorporated.  This gap in the case law can perhaps be explained by the fact that -- much like the Seventh Amendment's right to a civil jury trial -- almost every state has an equivalent to the Clause in its state constitution.  See Browning-Ferris, 492 U.S. at 264 & n.5.

Over a span of about three years beginning roughly a decade after Browning-Ferris, the United States Courts of Appeals for the Fifth, Seventh, and Ninth Circuits each held that the Excessive Fines Clause is incorporated against the states.  See Watson v. Johnson Mobile Homes, 284 F.3d 568, 572 (5th Cir. 2002); Wright v. Riveland, 219 F.3d 905, 915-19 (9th Cir. 2000); Towers v. City of Chicago, 173 F.3d 619, 623-24 (7th Cir. 1999).  More importantly, around the same time, the Supreme Court issued a seemingly authoritative word on the matter.

In Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001)("Cooper"), the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court -- who had been the sole Justice to join Justice O'Connor's opinion in Browning-Ferris -- wrote for the majority that,

> [d]espite the broad discretion that States possess with respect to the imposition of criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion. That Clause makes the Eighth Amendment's prohibition against excessive fines and cruel and unusual punishments applicable to the States.

Cooper, 532 U.S. at 433-34 (citation omitted).

Although this proclamation would seem to have closed discussion on the question of incorporation, the Supreme Court reopened it again in 2010. In McDonald v. City of Chicago, the Supreme Court welcomed the Second Amendment's right to bear arms into the pantheon of incorporated rights (it remains its newest member). The Honorable Samuel A. Alito, Jr., Associate Justice of the Supreme Court, writing for the majority, described the doctrine of selective incorporation in detail, noting:

> In addition to the right to keep and bear arms (and the Sixth Amendment right to a unanimous jury verdict), the only rights not fully incorporated are (1) the Third Amendment's protection against quartering of soldiers; (2) the Fifth Amendment's grand jury indictment requirement; (3) the Seventh Amendment right to a jury trial in civil cases; and (4) the Eighth Amendment's prohibition on excessive fines.
>
> We never have decided whether the Third Amendment or the Eighth Amendment's prohibition of excessive fines applies to the States through the Due Process Clause. See Browning-Ferris, 492 U.S. at 276, n.22 (declining to decide whether the excessive-fines protection applies to the States).

McDonald v. City of Chicago, Ill., 561 U.S. at 765 n.13. The most recent word from the Supreme Court is, thus, that the right against excessive fines is "not fully incorporated," because the Supreme Court "never ha[s] decided whether" it is. 561 U.S. at 765 n.13. See 2 William J. Rich, Modern Constitutional Law § 26:3 n.14 (3d ed.)(Incorporation of the Bill of Rights)(listing the right against excessive fines as an unincorporated right); 1 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, Criminal Procedure § 2.6(b) (3d ed.)(Guarantees not yet incorporated)(listing the Excessive Fines Clause).

That the Supreme Court has not yet issued a case expressly incorporating the Excessive Fines Clause, however, does not mean that it is not incorporated. It seems to the Court that there are three rungs on the incorporation ladder: (i) rights that the Supreme Court has expressly incorporated; (ii) rights on which the Supreme Court has either remained silent or has stated that they "remain unincorporated," "have not yet been incorporated," or "are not incorporated,"; and (iii) rights that the Supreme Court has expressly held do not apply against the states. Most rights in the Bill of Rights are now in the first category. The Third Amendment's protection against quartering soldiers, Sixth Amendment's Vicinage Clause, and the Eight Amendment's Excessive

Fines Clause are the second category. The Fifth Amendment's grand-jury right, the Sixth Amendment's rights to a unanimous, twelve-person criminal jury, and the Seventh Amendment's civil jury right are in the third category.

The Supreme Court's placement of rights into the first and third categories constitutes legal holdings on issues of federal law, and thus bind all state and federal courts nationwide. The Court notes that, while the third category is binding as a matter of vertical stare decisis -- no federal court, nor technically any state court, may hold that, <u>e.g.</u>, the federal constitutional grand-jury right applies to the states, because there is a Supreme Court case, <u>Hurtado v. California</u>, which expressly holds to the contrary -- the vitality of those cases, as a matter of horizontal stare decisis, is suspect. <u>See</u> <u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. at 765 n.13 ("Our governing decisions regarding the Grand Jury Clause of the Fifth Amendment and the Seventh Amendment's civil jury requirement long predate the era of selective incorporation."). The second category, however, reflects the Supreme Court's decision not to pass on the incorporation question -- and subsequent acknowledgements of the decision not to pass on the question -- as a matter of constitutional avoidance. These decisions do not constitute "holdings" and thus do not bind either the state or federal courts. In fact, several federal appellate courts have held that rights in the second category are incorporated. <u>See</u> <u>United States v. Nichols</u>, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988)(Third Amendment); <u>Engblom v. Carey</u>, 677 F.2d 957 (2d Cir. 1982)(same); <u>Caudill v. Scott</u>, 857 F.2d 344 (6th Cir. 1988); <u>Cook v. Morrill</u>, 783 F.2d 593 (5th Cir. 1986)(Vicinage Clause); <u>Zicarelli v. Dietz</u>, 633 F.2d 312 (3d Cir. 1980)(same); <u>Watson v. Johnson Mobile Homes</u>, 284 F.3d 568, 572 (5th Cir. 2002)(Excessive Fines Clause); <u>Wright v. Riveland</u>, 219 F.3d 905, 915-19 (9th Cir. 2000)(same); <u>Towers v. City of Chicago</u>, 173 F.3d 619, 623-24 (7th Cir. 1999)(same).

This seemingly mundane observation -- that the Supreme Court's avoidance of a question is not binding as a negative answer to that question -- is often obfuscated by two peculiarities of the incorporation context. First, only the Supreme Court of the United States -- and not the Courts of Appeals -- can bind state courts, even on matters of federal law (no federal court, including the Supreme Court, can bind state courts on matters of state law). <u>See</u> <u>Steffel v. Thompson</u>, 415 U.S. 452, 482 n.3 (1974)(Rehnquist, J., joined by Burger, C.J., concurring); <u>Perez v. Ledesma</u>, 401 U.S. 82, 125 (1971)(Brennan, J., joined by White & Marshall, JJ., dissenting)(referring to "the persuasive force" of a decision of a lower federal court on state courts); Daniel J. Meltzer, <u>State Court Forfeitures of Federal Rights</u>, 99 Harv. L. Rev. 1130, 1231 n.495 (1986); David L. Shapiro, <u>State Courts and Federal Declaratory Judgments</u>, 74 Nw. U. L. Rev. 759, 771 (1979). At least some state courts consider themselves bound by federal lower-court interpretations of federal law; it is not clear whether they view federal district court opinions, or only intermediate-appellate decisions, as binding. <u>See</u> <u>Handy v. Goodyear Tire & Rubber Co.</u>, 160 So. 530 (1935)(holding that the federal appellate courts' "decision[s] involve[ing] construction and application of [a] federal statute . . . [are] binding on state courts"); <u>Kuchenmeister v. Los Angeles & S.L.R.</u>, 172 P. 725 (1918)("If, therefore, there is a decision from a federal court which is decisive of the question here, and especially if the federal decision is one that is more recent than the one cited from a state court, it is our duty to follow the federal court rather than the state court, since the question involved is one upon which the federal courts have the ultimate right to speak."). This rule is always true -- its application is not limited to decisions about incorporation -- but its impact in the incorporation context virtually nullifies any decision that the lower federal courts might make about whether a right is incorporated. Because

the only effect of a holding that a right is incorporated is that the right applies against the state -- the holding says nothing about the right's substance or scope -- and because the state courts are free to ignore lower-federal-court holdings on the issue, the only binding effect that such a holding has is the potential creation of a federal-court-only civil cause of action against the state; the rights that the lower federal courts incorporate cannot even give rise to federal habeas relief. See Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d) ("[A] writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted . . . unless the adjudication . . . was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States . . . ." (emphasis added)).

　　　　To some extent, this situation always exists between the lower federal courts and the state courts; for example, if the Supreme Court of New Mexico interpreted the Supreme Court of the United States' First Amendment precedent as not protecting expressive activity X, and the Tenth Circuit interpreted the First Amendment to protect X, then citizens that New Mexico punished for partaking in X would be limited to the federal courts in seeking recourse. That example, however, follows the pattern that the Court already laid out as being the only effective result of a lower federal court incorporation holding: case-by-case resolution of individual claims in the federal courts. The more systemic impacts that judicial opinions often have -- the ones that have an effect on individuals beyond those who come directly before the courts, such as striking down statutes and invalidating programs -- would seem to be off the table as it relates to rights that only the lower federal courts have incorporated. For example, the Second Circuit held that the Third Amendment's protection against quartering soldiers is incorporated against the states. See Engblom v. Carey, 677 F.2d 957 (2d Cir. 1982). While that holding may seem to entail that the Third Amendment prohibits the states of Connecticut, New York, and Vermont from quartering soldiers in private residences, any of those states' legislatures could adopt a soldier-quartering program, and the state's supreme court could, without flouting the law, uphold it. This example is designed for a specific purpose; in all likelihood such a program would violate the federal Fourth Amendment and several other federal and state laws. The program's victims could, on a case-by-case basis, file for individual relief in federal court, and the federal courts could grant the relief, but the state courts would be under no obligation to align their rulings with the federal courts' until the Supreme Court speaks on the issue. It is not entirely clear whether, under such circumstances, a federal judgment purporting to strike down the program would be valid. See Yniguez v. Mofford, 939 F.2d 727, 730 n.1, 735-37 & nn.7-11 (9th Cir. 1991)(Reinhardt, J.). Lower federal-court holdings regarding incorporation are thus different from other lower-federal-court interpretations of federal law: the applicability of most federal law -- i.e., the United States Code -- to the states is not in dispute, even if its precise scope and meaning is, see U.S. Const. art. VI, cl. 2 (Supremacy Clause); the only other context in which the potential for such a standoff between the lower federal courts and the state courts exists is with federal-preemption doctrine.

　　　　The second peculiarity that causes incorporation doctrine to be decided almost exclusively at Supreme Court of the United States-level is that, although they can, state courts have little incentive to hold that a federal constitutional right is incorporated if the Supreme Court of the United States has left the question open. The Bill of Rights is a floor, not a ceiling, and state courts can interpret their own constitutions -- which often contain provisions closely mirroring the federal Bill of Rights -- or statutes to provide for the right in question. See Pena v. Greffet, No. CIV 12-0710 JB/KBM, 2015 WL 3860084, at *25 (D.N.M. June 17, 2015)

(Browning, J.)(citing State v. Cardenas-Alvarez, 2001-NMSC-017, ¶¶ 32–35, 25 P.3d 225, 237-40)(discussing the New Mexico state courts' embrace of "New Federalism," a doctrine of state-level expansion on federal constitutional rights, which the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court of the United States, championed).  By voluntarily holding that an as-yet unincorporated federal constitutional provision binds them, they risk (i) that the Supreme Court of the United States will overrule them and hold that the provision is not incorporated -- possibly even resulting in an unfixable reversal in the case in which the state supreme court applied the right, if the state supreme court did not go out of its way to additionally base its decision on an adequate and independent state ground, see Michigan v. Long, 463 U.S. 1032 (1983); or (ii) that the Supreme Court of the United States will, in subsequent decision, go on to define the contours of the right in a way that the state supreme court does not like.

For its part, the Court concludes that the Excessive Fines Clause is incorporated against the states.  The Court does not fully subscribe to Justice O'Connor's reasoning that there is "no reason to distinguish one Clause of the Eighth Amendment from another for the purposes of incorporation."  Browning-Ferris, 492 U.S. at 287.  Whatever the merits of Justice O'Connor's stance may be, the Supreme Court does parse amendments down into their constituent clauses and rights for incorporation purposes -- sometimes incorporating some, but not all, of an amendment.  Compare Hurtado v. California, 110 U.S. 516 (holding that states need not honor the Fifth Amendment grand-jury right), with Griffin v. California, 380 U.S. 609 (incorporating the Fifth Amendment right against self-incrimination against the states), Benton v. Maryland, 395 U.S. 784 (incorporating the Fifth Amendment probation on successive prosecutions), and Chi., Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226 (incorporating the Fifth Amendment right against deprivation of property without just compensation).  To the Court, however, the nature of a criminal fine is that each of its properties -- its purpose, the type and severity of its incursion on liberty, and the legal process attendant to its imposition -- overlap with at least one of the following: (i) punitive damages; (ii) criminal imprisonment; and (iii) bail.  Each of those three incursions on personal liberty is subject to federal constitutional constraints, even when a state imposes them.  See BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996) (holding that punitive damages that a state court imposed pursuant to state law violated the federal Due Process Clause); Kennedy v. Louisiana, 554 U.S. 407 (2008)(holding that the federal Cruel and Unusual Punishments Clause imposes on state-court proceedings a proportionality requirement between the severity of a crime and the magnitude of its sentence); Schilb v. Kuebel, 404 U.S. 357 (incorporating the Excessive Bail clause against the states).  The Court will compare criminal fines with each of these other penalties and describe how their similarities support incorporation of the Excessive Fines Clause.

Punitive damages involve the same type of liberty incursion -- deprivation of money -- for much the same purpose -- to punish -- and are imposed subject to a similar process -- a trial on the merits.  The case for applying constitutional strictures to criminal fines is, in most ways, stronger than the case for applying them to civil fines: a government has a greater incentive to abuse monetary impositions when it is the direct recipient of the money than when it is refereeing a dispute between private third parties.  Cf. U.S. Const. amend V ("[N]or shall private property be taken for public use, without just compensation.").  The recent unrest in Ferguson, Missouri, provides a good example of the hazards of vesting governments with the unchecked authority to fine:

- 28 -

---

The City budgets for sizeable increases in municipal fines and fees each year, exhorts police and court staff to deliver those revenue increases, and closely monitors whether those increases are achieved. . . .

. . . .

Ferguson has allowed its focus on revenue generation to fundamentally compromise the role of Ferguson's municipal court. The municipal court does not act as a neutral arbiter of the law or a check on unlawful police conduct. Instead, the court primarily uses its judicial authority as the means to compel the payment of fines and fees that advance the City's financial interests. . . .

. . . .

To handle the increasing caseload, the City Manager also requested and secured City Council approval to fund additional court positions, noting in January 2013 that "each month we are setting new all-time records in fines and forfeitures," that this was overburdening court staff, and that the funding for the additional positions "will be more than covered by the increase in revenues."

. . . .

[F]or fiscal year 2015, the City's budget anticipates fine and fee revenues to account for $3.09 million of a projected $13.26 million in general fund revenues.

. . . .

Even more recently, the City's Finance Director stated publicly that Ferguson intends to make up a 2014 revenue shortfall in 2015 through municipal code enforcement, stating to <u>Bloomberg News</u> that "[t]here's about a million-dollar increase in public-safety fines to make up the difference." . . .

United States Department of Justice Civil Rights Division, <u>Investigation of the Ferguson Police Department</u>, 2, 3, 9, 10, 13  (Mar. 4, 2015)(footnotes omitted).  Originally intended primarily to investigate the shooting death of an African-American teenager at the hands of a Ferguson police officer, the DOJ's investigation ultimately produced a 105-page final report devoted primarily to the city's allegedly exploitative and excessive fine-administration and -collection system.

The constitutional procedural protections attendant to criminal proceedings, namely the beyond-a-reasonable-doubt standard and the right to assistance of counsel -- whose existence (and incorporation) might seem to obviate the need for the additional incorporation of a protection against excessive criminal fines -- do not typically apply unless the crime or violation also carries the potential for a prison sentence, in addition to a fine.  See <u>Blanton v. City of N. Las Vegas</u>, 489 U.S. 538 (1989)(holding that the Sixth Amendment does not guarantee a jury trial on petty offenses, which presumptively includes all crimes whose maximum sentence of

incarceration is below six months, but leaving room for the possibility that "additional penalties [such as monetary fines] . . . [may be] so severe [as to indicate] that the legislature clearly determined that the offense is a serious one" meriting a jury trial); Scott v. Illinois, 440 U.S. 367 (1979)(holding that there is presumptively no right to assistance of counsel when the defendant does not face the possibility of incarceration).  Even when the threshold finding of criminal guilt is predicated on a jury verdict (or waiver thereof) by proof beyond a reasonable doubt, a judge -- by way of a combination of preponderance-of-the-evidence factfinding and judicial discretion -- typically decides both the binary determination whether to impose a find and the incremental determination of its amount.

The similarities between fines and cruel and unusual punishment also cut in favor of incorporation.  Criminal fines exist to effectuate the same goals as the "punishments" to which the Cruel and Unusual Punishments Clause refers: deterrence -- both specific and general; incapacitation; rehabilitation; and punishment.  See 18 U.S.C. § 3553(a) (titled "Factors to be considered in imposing a sentence"); id. § 3572(a) (directing district courts to consider "the factors set forth in section 3553(a)" in "determining whether to impose a fine, and the amount").  See also United States v. Courtney, No. CR 11-2860 JB, 2014 WL 7472975, at *32 n.13 (D.N.M. Dec. 15, 2014)(Browning, J.)(outlining the differences between specific and general deterrence).  It is important to note that fines, unlike restitution and costs of prosecution -- and unlike non-punitive damages, for that matter -- lack any compensatory purpose.  Fines and incarceration are typically imposed via the same basic procedural mechanisms: a beyond-a-reasonable-doubt trial (or waiver thereof) at the liability phase, followed by preponderance-of-the-evidence judicial factfinding and discretion at the penalty phase.  Moreover, there is a key overlap in the analytical standards of both the Cruel and Unusual Punishments Clause and the Excessive Fines Clause: both require a loose proportionality between the crime committed and the penalty imposed.  See Kennedy v. Louisiana, 554 U.S. at 419 ("[T]he Eighth Amendment's protection against excessive or cruel and unusual punishments flows from the basic 'precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense.'" (citing Weems v. United States, 217 U.S. 349, 367 (1910))(alterations in Kennedy v. Louisiana but not in Weems v. United States)); United States v. Bajakajian, 524 U.S. 321, 334 (1998)("The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality."  (citing Austin v. United States, 509 U.S. 602, 622-23 (1993))).  Of course, the nature of the penalties with which the Cruel and Unusual Punishments Clause deals -- incarceration and the death penalty -- are more serious than those with which the Excessive Fines Clause deals, and that fact cuts against incorporation of the latter Clause against the states, but the similarities between the two Clauses are still great enough to be instructive.

Last, criminal fines share some features with bail.  Both are monetary impositions associated with a criminal case.  Bail has the fewest procedural safeguards associated with it of any of the penalties discussed -- bail is imposed while the defendant is presumed innocent, with relatively minimal process -- and thus the justifications for incorporating the Excessive Bail Clause's substantive constraints on the magnitude of the bail are strong.  Still, one's failure to pay a designated fine, like one's failure to pay an assigned bail amount, often results in jail.  In the bail context, the Constitution deals with this potentially hazardous opportunity for governmental abuse by imposing substantive limitations on bail -- i.e., limiting its amount -- rather than procedural ones, such as requiring a certain burden of proof or factfinding process.  While there are procedural protections built into the federal bail-setting process, they are

VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

punishments inflicted.").  At the hierarchy's middle tier -- mandatory for the district court, but

subject to the Excessive Fines Clause's constraints -- are three United States Code sections: the

general sentencing statute, 18 U.S.C. § 3553(a), and the fines-specific sentencing statute,

18 U.S.C. § 3572(a), both of which bow to the substantive criminal statute under which the

defendant is convicted, which obviously varies depending on the case.  At the third and lowest

level -- nonbinding on the district court[6] -- are two Guidelines provisions: the general fines

statutory, not constitutional, and apply only to the federal courts.  See 18 U.S.C. §§ 3141-3150.
The Supreme Court has incorporated the Excessive Bail Clause's substantive safeguards against
the states.  See Schilb v. Kuebel, 404 U.S. 357.  If the Supreme Court deemed it to be "implicit
in the concept of ordered liberty" to have substantive safeguards against one form of "excessive"
imprisonment-threatening monetary imposition, then it probably follows that the Constitution's
analogous constraints on the other form mentioned in the same amendment should, likewise, be
incorporated.

> [6]Attorneys and courts often say that "the Guidelines are . . . advisory," but it appears
more appropriate to say that the Guidelines ranges are advisory.  Gall v. United States, 522 U.S.
at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now
advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines
are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th
Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly
calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding
that the Guidelines are advisory.").  The Court must consider the guidelines, see Gall v. United
States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the
extent of any departure from the Guidelines . . . ."), and must accurately calculate the guideline
range, see id. at 49 ("[A] district court should begin all sentencing proceedings by correctly
calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a
sentence within the calculated guideline range.  See United States v. Sierra-Castillo, 405 F.3d
932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences
outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No.
CR 08-2499 JB, 2010 WL 3075285, at *2–3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when
sentencing a criminal defendant: first, determining the appropriate sentencing
range on the basis of Guidelines' chapters 2 through 4; next, applying
Guidelines-contemplated departures based on parts 5H and 5K; and, only then,
varying from the Guidelines framework on the basis of the § 3553(a) factors taken
as a whole.  The Court must follow this sequence, because: (i) the Guidelines

guideline, U.S.S.G. § 5E1.2, and the guideline for the substantive offense, to which it bows.  As

is typical of such hierarchies, the successively lower tiers of authority provide more specific and

detailed guidance about what the district court should do, and -- while it should not be

assumed -- compliance with the lower-tier authority is likely to produce compliance with the

higher-tier authority.  See Kimbrough v. United States, 552 U.S. 85, 89 (2007)(stating that, in the

ordinary case, the Guidelines "sentencing range will 'reflect a rough approximation of sentences

that might achieve § 3553(a)'s objectives'" (quoting Rita v. United States, 551 U.S. 338, 350

---

expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence"  (emphasis added)).

United States v. Nolf, No. CR 10-1919, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

(2007))); United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006)("[A] sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness."); United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[I]t was error for the district court to apply the appellate presumption of reasonableness to the advisory guidelines when sentencing."  (citing Rita v. United States, 551 U.S. 338)).  As such, district courts should start with the Guidelines and then move to the statute in selecting an appropriate fine, and only then analyze whether the selected fine violates the Excessive Fines Clause.  Cf. U.S.S.G. § 1B1.1; United States v. Nolf, 30 F. Supp. 3d 1200, 1222-42 (D.N.M. 2014) (Browning, J.)(concluding that district courts must follow a certain sequence during sentencing, first calculating the Guidelines range and then looking to statutory considerations).  The Court will describe, in order, the steps involved in imposing a criminal fine.

### 1.    The Court Must First Calculate the Guidelines Range.

The Guidelines direct that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine," although the Guidelines' overall advisory status post-United States v. Booker, as a practical matter, undoes the text's mandatory language.  U.S.S.G. § 5E1.2(a).  The Guidelines set forth a four-step process for imposing fines.

### a.    Step One: Assess the Defendant's Ability to Pay.

Anyone can serve a prison sentence, but not everyone can pay a fine.  The fine guideline's exception for "defendant[s who] establish[] that [they are] unable to pay and [are] not likely to become able to pay any fine" trumps, as a practical matter, everything else in the determining whether to impose a fine.  U.S.S.G. § 5E1.2(a).

> The determination of the fine guideline range may be dispensed with entirely upon a court determination of present and future inability to pay any fine.

> The inability of a defendant to post bail bond (having otherwise been determined eligible for release) and the fact that a defendant is represented by (or was determined eligible for) assigned counsel are significant indicators of present inability to pay any fine. In conjunction with other factors, they may also indicate that the defendant is not likely to become able to pay any fine.

U.S.S.G. § 5E1.2 cmt. 3. If the defendant is unable to pay a fine, the district court should impose other forms of punishment in lieu of the appropriate fine; the district court should not simply waive the fine. See U.S.S.G. § 5E1.2(e). Community service is the preferred alternative punishment when fines are unavailable. See U.S.S.G. § 5E1.2(e).

This assessment starts with the defendant's literal ability to pay -- i.e., the figure that the defendant could pay if the defendant both liquidated all of his or her assets, and devoted all the future discretionary income that he or she is likely to earn to paying the fine -- but the district court may[7] cap this figure at the point at which the defendant actually paying it "would unduly burden the defendant's dependents" or other third parties. U.S.S.G. § 5E1.2(e). The Guidelines give no further guidance about how to determine a defendant's ability to pay, but, at this stage, the district court's focus should be on ascertaining the maximum fine available to be imposed -- including whether the defendant can pay any fine -- rather than on balancing the defendant's resources and the fine's effect on third parties against the need for the fine. The district court can conduct that balancing after determining the Guidelines range for the fine, at the statutory-factors stage.

---

[7]The Guidelines say "may," and not "must" or "shall." U.S.S.G. § 5E1.2(e). The Guidelines do not specify to what factors the district court should look in deciding whether and to what extent to reduce a fine on the basis of the hardships it would cause to third parties. The Court, however, concludes that three primary factors should be: (i) the number of third parties affected and magnitude of their hardship; (ii) their degree of culpability in the defendant's criminal conduct -- meaning their own probable innocence and their lack of knowledge of the conduct; and (iii) the extent to which the third parties function as a support system for the defendant, and likelihood that their avoiding the financial hardships of a fine will translate into reduced odds of recidivism for the defendant.

### b.    Step Two: Check for Overrides.

The second step is a check for overrides.  First, the district court should check the guideline for the substantive offense, and, "[i]f . . . the guideline for the offense in Chapter Two provides a specific rule for imposing a fine, that rule takes precedence over" the generic fine guideline.  U.S.S.G. § 5E1.2(b).  Second, the district court should also check the statute of conviction, and, if the statute authorizes either a maximum fine greater than $250,000.00 or a daily compounding fine, then the district court -- which must still go through the other steps of the Guidelines fine calculation -- should replace the Guidelines range's maximum fine with the statutory maximum fine.  See U.S.S.G. § 5E1.2(c)(2), (4).

### c.    Step Three: Calculate the Offense Level.

The third step is the same one that applies when determining the proper sentence of imprisonment to impose; this calculation need only be done once, and if the Court has already calculated the defendant's offense level for incarceration purposes, the offense level is the same for fine purposes.  In determining a defendant's offense level, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt. 1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

- 35 -

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be

determined" based on the following:

**(1)**     **(A)**     all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

         **(B)**     in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

**(2)**     solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

**(3)**     all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

**(4)**     any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not

resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards

lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may

rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence

standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.),

aff'd 523 F.3d 1258 (10th Cir. 2008).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for

the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments that the Fifth Amendment's Double Jeopardy Clause protects.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and that "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious

sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity."  515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  See United States v. Watts, 519 U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's

argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The

Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).[8]

-------

[8]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since described its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704

### d.   Step Four: Determine the Guidelines Range.

Once the district court has calculated the offense level, it can determine the Guidelines fine range.  Unlike with imprisonment, the defendant's criminal history has no impact on his or her Guidelines fine range.  Also unlike with imprisonment, the Guidelines establish different fine ranges only for different bands of offense levels, and not for each successive offense level.  The following table shows the Guidelines fine ranges for various offense-level bands:

| Offense Level | Minimum Fine | Maximum Fine |
|---|---|---|
| ≤ 3 | $100.00 | $5,000.00 (or statutory maximum, if applicable) |
| 4-5 | $250.00 | $5,000.00 (or statutory maximum, if applicable) |
| 6-7 | $500.00 | $5,000.00 (or statutory maximum, if applicable) |
| 8-9 | $1,000.00 | $10,000.00 (or statutory maximum, if applicable) |
| 10-11 | $2,000.00 | $20,000.00 (or statutory maximum, if applicable) |
| 12-13 | $3,000.00 | $30,000.00 (or statutory maximum, if applicable) |
| 14-15 | $4,000.00 | $40,000.00 (or statutory maximum, if applicable) |
| 16-17 | $5,000.00 | $50,000.00 (or statutory maximum, if applicable) |
| 18-19 | $6,000.00 | $60,000.00 (or statutory maximum, if applicable) |
| 20-22 | $7,500.00 | $75,000.00 (or statutory maximum, if applicable) |
| 23-25 | $10,000.00 | $100,000.00 (or statutory maximum, if applicable) |
| 26-28 | $12,500.00 | $125,000.00 (or statutory maximum, if applicable) |
| 29-31 | $15,000.00 | $150,000.00 (or statutory maximum, if applicable) |

---

F.3d 1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008).  See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level by 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument).

| 32-34 | $17,500.00 | $175,000.00 (or statutory maximum, if applicable) |
| 35-37 | $20,000.00 | $200,000.00 (or statutory maximum, if applicable) |
| ≥ 38 | $25,000.00 | $250,000.00 (or statutory maximum, if applicable) |

See U.S.S.G. § 5E1.2(c)(3).

**2.     The Court Must Then Consult the Statutory Factors.**

In addition to any fine provisions that the substantive statute of conviction may contain, there are two statutes that always apply to the imposition of criminal fines.  Section 3553(a) governs sentencing generally -- incarceration, supervised release, probation, fines, and restitution -- while § 3572(a) covers fines, specifically.  If there were any question whether § 3553(a) still applies to fines despite the existence of a more specific statute, § 3572(a) puts them to rest, directing courts to consider the § 3572(a) factors "in addition to the factors set forth in section 3553(a)."  18 U.S.C. § 3572(a).

These two sections are on equal footing -- neither is subordinate to or subject to the other -- and each contains a list of factors for the district court to consider in imposing its sentence. The fourteen[9] pertinent factors are: (i) the offense's nature and circumstances, and the defendant's history and characteristics, see 18 U.S.C. § 3553(a)(1); (ii) the need for the sentence imposed to reflect the offense's seriousness, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, see 18 U.S.C. § 3553(a)(2); (iii) the Guidelines fine range, see 18 U.S.C. § 3553(a)(4); (iv) whether the defendant has previously been fined for a

---

[9]Section 3553(a) contains seven factors and § 3572(a) contains eight factors.  The Court has omitted § 3553(a)(3), "the kinds of sentences available," because, for the purposes of this list, the Court is talking about fines.  The Court has also omitted one of the § 3553(a)(2) subfactors, the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," because it is inapplicable to fines.  18 U.S.C. § 3553(a)(4)(D).

similar offense, whether the defendant faces collateral consequences, such as civil lawsuits, from his or her actions, and any other pertinent Guidelines policy statements, see 18 U.S.C. § 3553(a)(5); U.S.S.G. § 5E1.2(d)(5)-(6);[10] (v) the need to avoid unwarranted fine disparities among defendants with similar records who have been found guilty of similar conduct, see 18 U.S.C. § 3553(a)(6); (vi) the need to provide restitution to any victims of the offense, see 18 U.S.C. § 3553(a)(7); (vii) the defendant's income, earning capacity, and financial resources, see 18 U.S.C. § 3572(a)(1); (viii) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose, see 18 U.S.C. § 3572(a)(2); (ix) any pecuniary loss inflicted upon others as a result of the offense, see 18 U.S.C. § 3572(a)(3); (x) whether restitution is ordered or made and the amount of such restitution, see 18 U.S.C. § 3572(a)(4); (xi) the need to deprive the defendant of illegally obtained gains from the offense, see 18 U.S.C. § 3572(a)(5); (xii) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence, see 18 U.S.C. § 3572(a)(6); (xiii) whether the defendant can pass on to consumers or other

---

[10]Section 3553(a)(5) directs district courts to consider "any pertinent policy statement" in the Guidelines. 18 U.S.C. § 3553(a)(5). The Guidelines contain their own list of 8 factors for the district court to consider when selecting where exactly, within the offense level-determined Guidelines range, to set the fine. See U.S.S.G. § 5E1.2(d). Of these 8 factors, however, only 2 -- "any collateral consequences of conviction, including civil obligations arising from the defendant's conduct," and "whether the defendant previously has been fined for a similar offense" -- are not already covered by the fine statute, § 3572(a). U.S.S.G. § 5E1.2(d)(5)-(6). Rather than summarize the Guidelines factors in full at the Guidelines-calculation stage and then largely repeating those same factors at the variance stage, the Court will incorporate the two non-statutory § 5E1.2(d) factors into the § 3553(a) factor that directs district courts to consider them. This treatment is appropriate, given that the § 5E1.2(d) factors, despite being in the Guidelines, do not go to determining the Guidelines range, which is determine based solely on offense level. See U.S.S.G. § 5E1.2(c).

persons the expense of the fine, see 18 U.S.C. § 3572(a)(7); and (xiv) if the defendant is an organization, the size of the organization and any measures it has taken to discipline any officer, director, employee, or agent of the organization responsible for the offense or to prevent a recurrence of such an offense.  Some of these factors are categorically inapplicable to certain cases or defendants.  Factor (xiv), and usually factor (xiii), apply only to business-entity defendants.  See 18 U.S.C. § 3572(a)(6)-(7).  Factors (vi) and (x), which concern restitution, are inapplicable to cases that lack an identifiable victim.[11]  See 18 U.S.C. §§ 3553(a)(7), 3572(a)(4). In cases where restitution is involved, however, those factors are of paramount importance, as the district court's imposition of a fine must not impede the defendant's ability to pay restitution. See 18 U.S.C. § 3572(b) ("[T]he court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution.").

The district court must weigh these factors to determine where in the Guidelines range to fine the defendant or whether to vary from the Guidelines fine range.  If the defendant can pay some, but not all, of an appropriate-level fine, or if imposition of an appropriate fine would cause some hardship to third parties, the district court may exercise its discretion and replace some of the fine with other punishment, preferably community service.  See U.S.S.G. § 5E1.2(e).  The district court may not, however, impose a fine alongside an alternative sentence -- effectively giving the defendant a choice of sanctions, or a fallback if he or she is unable to pay the fine -- but, rather, must impose a sum certain at the point of sentencing.  See 18 U.S.C. § 3572(e)

---

[11]District courts should still consider factor (ix), "any pecuniary loss inflicted upon others as a result of the offense," even when there is no identifiable victim.  18 U.S.C. § 3572(a)(3). Congress listed this factor separately from the restitution factor, and the court should seek to give that drafting decision content.  If the defendant's crime did not inflict any pecuniary loss on anyone -- and just because a crime lacks an identifiable victim does not mean that this is the case -- then this factor cuts in the defendant's favor.  See United States v. Valdez, No. CR 13-0559-2 JB, 2014 WL 7473803, at *28 n.16 (D.N.M. Dec. 15, 2014)(Browning, J.).

("[T]he court may not impose an alternative sentence to be carried out if the fine is not paid."). That said, a district court may make timely payment of the fine, or installments thereof, a condition of probation or supervised release.  See U.S.S.G. § 5E1.2(f).

As is the case generally with sentencing, district courts enjoy substantial discretion in deciding whether to impose a fine, determining the amount to impose, and fashioning terms of repayment.  See Gall v. United States, 552 U.S. at 49("[An] abuse-of-discretion standard of review applies to appellate review of all sentencing decisions -- whether inside or outside the Guidelines range.").  The Courts of Appeals review these decisions deferentially, reversing only for unreasonableness, which can be procedural or substantive.  "A sentence is procedurally unreasonable if the district court failed to calculate (or improperly calculated) the Guidelines range, treated the Guidelines as mandatory, failed to consider the § 3553(a) factors or failed to adequately explain the chosen sentence."  United States v. Middagh, 594 F.3d 1291, 1294 (10th Cir. 2010)(internal quotation marks omitted); United States v. Burgess, 576 F.3d 1078, 1101 (10th Cir. 2009)(internal quotation marks omitted).  "A sentence is substantively unreasonable if, considering the factors set forth in 18 U.S.C. § 3553(a), the sentence is unreasonable in length."  United States v. Ellis, 525 F.3d 960, 964 (10th Cir. 2008).  The Tenth Circuit affords sentences within the properly calculated Guidelines range with a rebuttable presumption of reasonableness, see United States v. Kristl, 437 F.3d at 1054, but that presumption is strictly for the appellate courts; district courts must fashion a sentence that incorporates all of the statutory factors, including the Guidelines range, see 18 U.S.C. § 3553(a)(4)(A) (directing courts to consider "the sentencing range . . . set forth in the guidelines"), but not limited to it or reliant on it to properly reflect the other factors, see United States v. Conlan, 500 F.3d at 1169 (holding that it is "error

for the district court to apply the appellate presumption of reasonableness to the advisory guidelines when sentencing" (citing Rita v. United States, 551 U.S. 338 (2007))).

>        3.        **The Fine Must Not Be Constitutionally Excessive.**

There are two inquiries associated with a constitutional excessive-fine analysis. First, the appellate court will inquire whether and how much of the fine is "punitive," rather than "remedial." United States v. Bajakajian, 524 U.S. 321, 331-32 (1998)("Bajakajian"). Only punitive fines -- or the punitive portions of part-remedial, part-punitive fines -- are subject to the Excessive Fines Clause; to the extent that part of the fine has a valid remedial justification, the courts will subtract that portion of the fine and analyze the punitive portion as if it was the only monetary sanction imposed. See Bajakajian, 524 U.S. at 331-32 & n.6; Austin v. United States, 509 U.S. 602, 621-22 (1993)("[A] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." (quoting United States v. Halper, 490 U.S. 435, 448 (1989))(emphasis and alteration in Austin v. United States but not in United States v. Halper)).

>        a.        **Remedial Versus Punitive Monetary Sanctions.**

Whether and to what extent a fine is "remedial" depends upon the facts of the case and not on the legal label assigned to the monetary sanction. Although labels can be instructive, because they tend to correlate to certain purposes -- "restitution" is almost always remedial, "civil in rem forfeitures" are typically remedial, and "fines" are typically punitive -- courts cannot rely on these labels and must make their own determinations about the nature of the sanction. See Austin v. United States, 509 U.S. 602, 618 (1993). To be clear, in the same way that a general assessment on a populace can be a tax for constitutional purposes and a non-tax for

statutory purposes, see Nat'l Federation of Indep. Business v. Sebelius, 132 S. Ct. 2566, 2594 (2012)("[T]he Act describes the payment as a 'penalty,' not a 'tax.'  But while that label is fatal to the application of the Anti-Injunction Act, it does not determine whether the payment may be viewed as an exercise of Congress's taxing power."  (citation omitted)), a government-imposed[12] monetary sanction, however labeled, is a "fine" under the Excessive Fines Clause only to the extent that it is punitive, see Bajakajian, 524 U.S. at 331-32 & n.6.  Statutory civil forfeitures, special assessments, and, even, theoretically, restitution could all be constitutional fines, while statutory fines could, likewise, fall outside of the Clause's scope.  See supra note 12.

It is not entirely clear what the term "remedial" means in the excessive-fines context. The Supreme Court appears, however, to have given the term a much narrower definition than it has in everyday use.  Two cases, both at the Supreme Court level, speak to this issue; in Austin v. United States, the Supreme Court wrote:

> We turn next to consider whether forfeitures under 21 U.S.C. §§ 881(a)(4) and (a)(7) are properly considered punishment today.  We find nothing in these provisions or their legislative history to contradict the historical understanding of forfeiture as punishment.  Unlike traditional forfeiture statutes, §§ 881(a)(4) and (a)(7) expressly provide an "innocent owner" defense.  These exemptions serve to focus the provisions on the culpability of the owner in a way that makes them look more like punishment, not less.  In United States v. United States Coin & Currency, 401 U.S. 715 (1971), we reasoned that 19 U.S.C. § 1618, which provides that the Secretary of the Treasury is to return the property of those who do not intend to violate the law, demonstrated Congress' intent "to impose a penalty only upon those who are significantly involved in a criminal enterprise."

---

[12]The "Excessive Fines Clause does not apply to awards of punitive dames in cases between private parties."  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 260 (1989)(holding that the Clause "limit[s] only those fines directly imposed by, and payable to, the government").  Interestingly, the Clause can apply to restitution -- which, obviously, like punitive damages and unlike most fines, ultimately goes to a private party and not to the government.  See Paroline v. United States, 134 S. Ct. 1710, 1726 (2014)("The primary goal of restitution is remedial or compensatory, but it also serves punitive purposes.  That may be 'sufficient to bring [it] within the purview of the Excessive Fines Clause.'"  (citations omitted)).

The inclusion of innocent-owner defenses in §§ 881(a)(4) and (a)(7) reveals a similar congressional intent to punish only those involved in drug trafficking.

Furthermore, Congress has chosen to tie forfeiture directly to the commission of drug offenses. Thus, under § 881(a)(4), a conveyance is forfeitable if it is used or intended for use to facilitate the transportation of controlled substances, their raw materials, or the equipment used to manufacture or distribute them. Under § 881(a)(7), real property is forfeitable if it is used or intended for use to facilitate the commission of a drug-related crime punishable by more than one year's imprisonment.

The legislative history of § 881 confirms the punitive nature of these provisions. When it added subsection (a)(7) to § 881 in 1984, Congress recognized "that the traditional criminal sanctions of fine and imprisonment are inadequate to deter or punish the enormously profitable trade in dangerous drugs." It characterized the forfeiture of real property as "a powerful deterrent."

The Government argues that §§ 881(a)(4) and (a)(7) are not punitive but, rather, should be considered remedial in two respects. First, they remove the "instruments" of the drug trade "thereby protecting the community from the threat of continued drug dealing." Second, the forfeited assets serve to compensate the Government for the expense of law enforcement activity and for its expenditure on societal problems such as urban blight, drug addiction, and other health concerns resulting from the drug trade.

In our view, neither argument withstands scrutiny. Concededly, we have recognized that the forfeiture of contraband itself may be characterized as remedial because it removes dangerous or illegal items from society. The Court, however, previously has rejected government's attempt to extend that reasoning to conveyances used to transport illegal liquor. In that case it noted: "There is nothing even remotely criminal in possessing an automobile." The same, without question, is true of the properties involved here, and the Government's attempt to characterize these properties as "instruments" of the drug trade must meet the same fate as Pennsylvania's effort to characterize the 1958 Plymouth sedan as "contraband."

The Government's second argument about the remedial nature of this forfeiture is no more persuasive. We previously have upheld the forfeiture of goods involved in customs violations as "a reasonable form of liquidated damages." But the dramatic variations in the value of conveyances and real property forfeitable under §§ 881(a)(4) and (a)(7) undercut any similar argument with respect to those provisions. The Court made this very point in Ward: The "forfeiture of property . . . [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law."

509 U.S. at 619-22 (citations omitted).   This passage suggests a reading of "remedial" so circumscribed as to strain its plain meaning, which is that a monetary sanction is not remedial if it is based on a finding that the defendant did something wrong.

The Supreme Court's next case, <u>Bajakajian</u> -- which has become the seminal case construing the Excessive Fines Clause -- did nothing to backtrack from <u>Austin v. United States</u>, and may have even narrowed the concept of remedial-ness further.   <u>Bajakajian</u> involved a defendant's conviction for taking $357,144.00 out of the country without authorization -- which is apparently required for more than $10,000.00.   <u>See</u> <u>Bajakajian</u>, 524 U.S. at 324.   Upon the defendant's conviction, the United States sought to keep the whole kit and caboodle, which the Supreme Court ruled would violate the Excessive Fines Clause:

> The Government specifically contends that the forfeiture of respondent's currency is constitutional because it involves an "instrumentality" of respondent's crime.   According to the Government, the unreported cash is an instrumentality because it "does not merely facilitate a violation of law," but is "'the very sine qua non of the crime.'"   The Government reasons that "there would be no violation at all without the exportation (or attempted exportation) of the cash."
>
> Acceptance of the Government's argument would require us to expand the traditional understanding of instrumentality forfeitures.   This we decline to do. Instrumentalities historically have been treated as a form of "guilty property" that can be forfeited in civil in rem proceedings.   In this case, however, the Government has sought to punish respondent by proceeding against him criminally, in personam, rather than proceeding in rem against the currency.   It is therefore irrelevant whether respondent's currency is an instrumentality; the forfeiture is punitive, and the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination.

<u>Bajakajian</u>, 524 U.S. at 333 (citations omitted).   The Supreme Court also noted that, while the instrumentality theory retains its vitality -- although apparently only in in rem proceedings[13] --

---

[13]Although both <u>Austin v. United States</u> and <u>Bajakajian</u> use the historical practice of in rem forfeitures of "guilty property" to illustrate when a sanction is remedial, the former case explicitly held that "forfeiture generally and statutory in rem forfeiture in particular historically have been understood, at least in part, as punishment."   <u>Austin v. United States</u>, 509 U.S. at 618

the money that the defendant was attempting to smuggle out of the country was not an

instrumentality of his crime:

> Although the term "instrumentality" is of recent vintage, it fairly
> characterizes property that historically was subject to forfeiture because it was the
> actual means by which an offense was committed.  "Instrumentality" forfeitures
> have historically been limited to the property actually used to commit an offense
> and no more.  A forfeiture that reaches beyond this strict historical limitation is
> ipso facto punitive and therefore subject to review under the Excessive Fines
> Clause.

> . . . .

> The currency in question is not an instrumentality in any event.  The Court
> of Appeals reasoned that the existence of the currency as a "precondition" to the
> reporting requirement did not make it an "instrumentality" of the offense.  We
> agree; the currency is merely the subject of the crime of failure to report.  Cash
> in a suitcase does not facilitate the commission of that crime as, for example, an
> automobile facilitates the transportation of goods concealed to avoid taxes.  In the
> latter instance, the property is the actual means by which the criminal act is
> committed.  See Black's Law Dictionary 801 (6th ed. 1990)("Instrumentality" is
> "[s]omething by which an end is achieved; a means, medium, agency").

Bajakajian, 524 U.S. at 333 nn.8-9 (citations omitted).  The Court interprets this final paragraph

narrowly.  While $357,144.00 in cash may not be an instrumentality, because it is legal to

possess, carry around, and use -- just not to take out of the country -- the Court concludes that a

large quantity of, e.g., methamphetamines, would not be.  To conclude otherwise would lead to

the absurd result that confiscation of large quantities of illegal drugs could -- if the drugs were

valuable enough and especially if the defendant's culpability was relatively low, e.g., a mule --

violate the Excessive Fines Clause.

---

(footnote omitted).  Thus, although the block-quoted passage of Bajakajian, taken out of context,
appears to imply that the procedural posture of the forfeiture suit -- in rem versus in personam --
is outcome dispositive whether the resultant forfeiture is a fine for Eighth Amendment purposes,
that is not the case.

b.      **The Requirement of Proportionality for Punitive Monetary Sanctions.**

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." Bajakajian, 524 U.S. at 334 (citing Austin v. United States, 509 U.S. at 622-23).  The proportionality inquiry is, as it sounds, a somewhat loose one.  It is also, rightly, deferential to both the district court's man-on-the-ground determinations and, more importantly, to Congress' decisions about what crimes should hold what penalties.  "[I]f the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional."[14]  United States v. 817 N.E. 29th Dr., 175 F.3d 1304, 1309 (11th Cir. 1999).

Beyond that deference to the legislature, the Supreme Court has outlined factors for the courts to consider when determining whether a fine is excessive, and the Tenth Circuit has supplemented those factors:

> [T]he [Supreme] Court examine[s] several factors.  One of the most important [i]s Congress's judgment about the appropriate punishment for the owner's offense. Maximum statutory fines provide guidance on the legislative view of the seriousness of the offense.  The fines set out in the sentencing guidelines, promulgated by the United States Sentencing Commission, are another way of "[t]ranslating the gravity of a crime into monetary terms."  Additional factors for consideration of the gravity of the offense include the extent of the criminal activity, related illegal activities, and the harm caused to other parties.
>
> . . . .
>
> [W]e must supplement the factors discussed by the Supreme Court.  As we explained in United States v. 829 Calle De Madero, 100 F.3d 734 (10th Cir. 1996), a case decided before Bajakajian, a proportionality analysis is

---

[14]The whole point of the Excessive Fines Clause, of course, is that it limits -- rather than trusts -- the government's discretion to levy large fines.  This presumption of validity raises the question whether the Clause's primary purpose is to cabin (i) legislatures' authority to set fines; or (ii) trial courts' authority to impose them.

"factually intensive," so that a catalog of factors is not "necessarily exclusive." Like Ms. Lees, the owner in 829 Calle De Madero challenged the constitutionality of a residential forfeiture under § 881(a)(7).  We stated that

> [i]n evaluating proportionality, courts must compare the severity of the offense with which the property was involved, the harshness of the sanction imposed, and the culpability of the claimant.  Relevant factors in assessing the harshness of the sanction include the value of the property forfeited, its function, and any other sanctions imposed upon the claimants by the sovereign seeking forfeiture. Against these factors, the severity of the offense must be evaluated, taking into account the extent of both the claimant's and the property's role in the offense, the nature and scope of the illegal operation at issue, the personal benefit reaped by the claimant, the value of any contraband involved in the offense, and the maximum sanction Congress has authorized for the offense.

> Thus, in addition to the Bajakajian factors, we suggested other considerations: the general use of the forfeited property, any previously imposed federal sanctions, the benefit to the claimant, the value of seized contraband, and the property's connection with the offense.  Bajakajian in no way undermines the relevance of these factors in a proportionality analysis for a forfeiture proceeding . . . .

United States v. Wagoner Cnty. Real Estate, 278 F.3d 1091, 1100-01 (10th Cir. 2002)(footnote omitted)(citations omitted).

Both the Supreme Court and the Tenth Circuit left open a vitally important question: whether the defendant's financial condition is relevant to the Excessive Fines Clause proportionality analysis, i.e., whether a given dollar-value fine for a given offense will be analyzed to the same result whether the defendant is a billionaire or a pauper.  The Supreme Court speaks only of "compar[ing] the amount of the forfeiture to the gravity of the defendant's offense," Bajakajian, 524 U.S. at 336-37 (emphasis added), and, while the Tenth Circuit refers to the "harshness of the sanction" -- which would seem to depend on the fine's effect on the specific defendant involved -- it defines the term, rather thoroughly, without reference to the defendant's wealth: "Relevant factors in assessing the harshness of the sanction include the value of the property forfeited, its function, and any other sanctions imposed upon the claimants by the

sovereign seeking forfeiture," United States v. Wagoner Cnty. Real Estate, 278 F.3d at 1101

(quoting United States v. 829 Calle De Madero, 829 F.3d at 738).

In fact, given the number of factors that United States v. Wagoner County Real Estate

sets forth as relevant to the proportionality analysis, the omission of even the slightest reference

to the defendant's financial state or the fine's impact on the specific defendant was almost

certainly intentional. The Tenth Circuit repeatedly states that its factors are non-exclusive, and it

certainly never comes out and explicitly states that the defendant's wealth is irrelevant, so this

omission may be more about avoiding the question than suggesting a negative answer to it. The

Supreme Court was clearer about basing its failure to engage this issue on avoidance. In a

footnote -- which was more-or-less apropos of nothing written above the line -- placed toward

the end of its Bajakajian opinion, the Supreme Court wrote: "Respondent does not argue that his

wealth or income are relevant to the proportionality determination or that full forfeiture would

deprive him of his livelihood, and the District Court made no factual findings in this respect."

524 U.S. at 340 n.15 (citation omitted). Whether the Excessive Fines Clause considers the

financial resources of the defendant -- i.e., whether the fine's magnitude as a percentage of the

defendant's assets matter, or just the absolute magnitude, and whether the financial state in

which payment of the fine will leave the defendant is relevant[15] -- remains an open question,

although there is nothing, except perhaps common sense, to suggest that it does.[16]

---

[15]There are, theoretically, three broad ways to define the "amount" or "harshness" of a fine. The first is simply the fine's absolute magnitude, i.e., the number behind the dollar sign. This definition does not take into account the defendant's resources at all. The second is the fine's magnitude as a percentage of the defendant's overall wealth, liquid assets, income, or disposable income. Although this definition is really several definitions -- as the fine can be based on wealth, income, or a subset of either -- they all relate to an "absolute proportion" of the defendant's resources, i.e., they all refer, in the end, to the number in front of the percentage sign. The third way of defining the harshness or amount of a fine focuses on the real diminution in quality of life that the fine is likely to impose on the defendant. A fine of a set percentage of

In contrast to the deferential abuse-of-discretion standard under which the Court of Appeals reviews fines for statutory reasonableness, whether a fine is constitutionally excessive is reviewed de novo.  See Bajakajian, 524 U.S. at 337 & n.10.  Although the nominal standard of review under the Excessive Fines Clause is high, the Clause's substance effectively builds deference into the review: despite being de novo, the Court of Appeals will reverse a district

_____

income or wealth will not necessarily produce the same average diminution in quality of life across defendants of all levels of income or wealth.  A defendant making $1,000,000.00 per year could likely weather a 50-percent-of-total-income fine much more comfortably than a defendant making $20,000.00 per year, even though the two fines, as a fraction of income, are the same, and the millionaire's fine is much greater in terms of absolute magnitude.  This concept -- known in economic parlance as diminishing marginal utility -- underlies the United States' system of progressive income taxation.

[16]The defendant's financial condition is at least indirectly built into the constitutional excessive-fines analysis.  Both the federal fine statute and the fine guideline direct courts to consider the defendant's resources, see 18 U.S.C. § 3572(a)(1)-(2) (directing courts to consider "the defendant's income, earning capacity, and financial resources," and "the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose"); U.S.S.G. § 5E1.2(d)(2)-(3) (directing courts to consider "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources," and "the burden that the fine places on the defendant and his dependents relative to alternative punishments"), and being imposed in keeping with the legislature's mandates is both necessary and sufficient for a fine to receive a "strong presumption" of constitutionality, United States v. 817 N.E. 29th Dr., 175 F.3d at 1309.

That the defendant's financial state is pertinent to the fine statute and compliant with the fine statute is part of the constitutional analysis, however, is not the same as the defendant's financial state being directly built into the constitutional analysis, for two reasons.  First, statutory compliance goes only to the binary determination whether the fine is afforded a presumption of constitutionality; it is unclear whether failure to take defendant-specific hardships into account can render a presumptively valid fine unconstitutional, or whether such consideration is necessary or helpful to render a fine without a presumption of constitutionality nonetheless valid.  It is important to bear in mind that, while a statutorily proper fine is presumptively constitutional, there is no indication that a statutorily excessive fine is presumptively unconstitutional.  Second, the federal fine statute and fine guideline may not apply in all cases, for all time.  Congress can amend the federal statute or guideline at any time.  Also, the Excessive Fines Clause is likely incorporated against the states, see supra note 5, and state fine statutes need not mirror the federal statute's provision for defendant-specific inquiries.

court's imposition of a fine only if the fine is "grossly disproportional to the gravity of [the] offense" and not if it is merely "too high." Bajakajian, 524 U.S. at 339-40. See id. at 336 ("[A]ny judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise[, which] counsel[s] against requiring strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense, and we therefore adopt the standard of gross disproportionality.").

## ANALYSIS

The Court will impose a sentence of 51-months imprisonment, 3-years supervised release, and a $13,133.33 fine. This term of incarceration is not only well below the bottom of her actual Guidelines range, 110-137 months, but it is also 27 months below the bottom of the working Guidelines range, 78-97 months, that obtains once the Court strips away 2 offense levels and a criminal history category from the actual Guidelines calculation.

## I.      THE COURT WILL IMPOSE 51 MONTHS OF IMPRISONMENT.

Basurto pled guilty to two counts -- one for heroin and one for methamphetamine -- for 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), for which the applicable sentencing guideline is § 2D1.1. She was in possession of 95.2 grams of heroin[17] and 11.5 grams of "actual" methamphetamine. PSR ¶ 24, at 8. Because she possessed two different drugs, the Court will look to the Guidelines drug-equivalency table and "convert the quantit[ies] of the [two] controlled substance[s] involved in the offense to [their] equivalent quantit[ies] of marihuana," add them together, and then "[u]se the offense level that corresponds to the equivalent quantity of marihuana as the base offense level." U.S.S.G. § 2D1.1 cmt. n. 8(A). One gram of heroin converts to 1 kilogram of

---

[17]Of this total, 94.1 grams were recovered from her home during the March 5, 2013, DEA visit. See PSR ¶ 10, at 6; id. ¶ 16, at 7. Basurto possessed the other 1.1 grams while on pretrial release. See PSR ¶ 19, at 7.

marijuana, and 1 gram of "actual" methamphetamine converts to 20 kilograms, see U.S.S.G. § 2D1.1 cmt. 8(D), so Basurto possessed the heroin equivalent of 95.2 kilograms of marijuana and the methamphetamine equivalent of 230 kilograms of marijuana, for a total marijuana equivalency of 325.2 kilograms, see PSR ¶ 24, at 8. The Guidelines indicate a base offense level of 26 for this quantity of marijuana. See U.S.S.G. § 2D1.1(c) (applying when the defendant possessed "[a]t least 100 KG but less than 400 KG of Marihuana").

From this base offense level, because "a dangerous weapon (including a firearm) was possessed, [the Court will] increase by 2 levels." U.S.S.G. § 2D1.1(b)(1). The Court will not apply an acceptance-of-responsibility adjustment, because she did not "voluntary terminat[e] or withdraw[] from [her] criminal conduct"; in fact, she persisted in the same criminal conduct that formed the basis of her conviction. U.S.S.G. § 3E1.1 cmt. n. 1(B). As such, she has not "clearly demonstrate[d] acceptance of responsibility," and she is not entitled to the reduction. U.S.S.G. § 3E1.1(a). Her final offense level under the Guidelines is, thus, 28. See PSR ¶ 32, at 9.

As for Basurto's criminal history, her May, 11, 1998, convictions for forgery and possession of a stolen credit card resulted in an eighteen-month sentence, which counts for 3 criminal history points. See U.S.S.G. § 4A1.1(a) ("Add 3 points for each prior sentence of imprisonment exceeding one year and one month."); PSR ¶ 39, at 11. Her July 16, 1998, conviction for receiving or disposing of stolen property resulted in a sentence of thirty-months imprisonment, and, likewise, imparts 3 criminal history points. See PSR ¶ 40, at 11. Last, her January 4, 2013, shoplifting conviction counts for 1 criminal history point, for a total of 7 points, which places her in criminal history category IV. See U.S.S.G. §§ 4A1.1(c); 5A; PSR ¶ 41, at 11-12. None of these three convictions is stale. The first two, because they carried a sentence of above one year and one month, are subject to a 15-year look-back window from the date of

the instant offense, and if any period of imprisonment for the offense is within the window, then the conviction counts.  See U.S.S.G. § 4A1.2(e)(1).  Basurto's last day of incarceration on the first conviction was, at the earliest,[18] on or about September 19, 1998; her last day of incarceration on the second conviction was, at the earliest, on or about October 7, 2000.  See PSR ¶¶ 39-40, at 11.  Both of those dates is within 15 years of the date of this offense, March 5, 2013, although not by much.  See PSR ¶ 10, at 6.

No one disputes any of the analysis to this point.  See 1st Tr. at 3:5-4:25 (Winterbottom, Court)(withdrawing Basurto's objection to the PSR's refusal to recommend an acceptance-of-responsibility adjustment).  Basurto makes the following requests: (i) for a so-called horizontal downward departure from a criminal history category of IV to one of I, on the grounds that 7 points over-represents her likelihood to recidivate; (ii) for a 2-offense level downward variance, on the grounds that a proposed amendment to the Guidelines, which appears likely to pass, will lower base offense levels for drug offenses by 2 levels; and (iii) that the Court should vary downward from the Guidelines range on account of Basurto's medical problems and her family situation.  The Court will grant one-third of the relief Basurto seeks in her first request and will grant her other two requests in full.

---

[18]The PSR does not contain the dates of release from custody, which is unfortunate, because that date is the only relevant one where prior felonies are involved.  See U.S.S.G. § 4A1.2(e)(1).  The PSR contains the date of the offense/arrest, the date of conviction, and the length of the term of imprisonment.  See PSR ¶¶ 39-41, at 11-12.  The Court cannot simply add the term of imprisonment on top of the date of conviction, however, because she might have served some of her sentence prior to her date of conviction, i.e., as "time served" awaiting trial. At the other extreme, marking off the term of imprisonment from the date of offense/arrest -- while likely to compute an early release date if Basurto spent any time at all released on recognizance or bail before trial -- is the fairest approach to Basurto, as it results in the earliest possible release-from-custody date and is thus the most likely to place prior convictions outside of the look-back window.  Moreover, if a prior crime is not stale under this method of estimation, then it cannot be stale.

Regarding the request for a horizontal departure, § 4A1.3 allows the Court to depart to a lower criminal history category than the one that §§ 4A1.1 and 4A1.2 -- the criminal history calculation guidelines -- indicate, "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."   U.S.S.G. § 4A1.3(b)(1) (emphasis added).   The Guidelines' guidance for when such a departure is warranted is sparse: "A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." U.S.S.G. § 4A1.3 cmt. 3.

After reviewing Basurto's prior convictions, the Court concludes that a criminal history category of IV substantially over-represents Basurto's criminal history and likelihood to recidivate.   Her two counted felony convictions are close to being, but not, stale: had Basurto committed this offense seven months later, her May, 1998, conviction would be stale, and she would have a 4 criminal history points and a criminal history category of III; had she committed this offense two years and seven months later, both of her prior felonies would be stale, and she would have a 1 criminal history point and a criminal history category of I.

The Court will reduce Basurto's criminal history category, but only by one category, making it a III.   The Court has four reasons for doing so.   First, while her May, 1998, conviction is teetering on the brink of staleness, her July, 1998, conviction is almost three years within the 15-year look-back window -- one-third of the total window.   It is fair to hold Basurto fully accountable for the more-recent conviction, and that conviction, alone, gets her up to a criminal history category of III.   Second, if these two not-quite-stale convictions were Basurto's first

crimes -- and, thus, all her priors were being counted for Guidelines purposes -- the Court might be inclined to depart further. Basurto, however, had a relatively extensive criminal history even before those offenses -- four convictions, two of which were felonies -- all of which are stale and thus not reflected in her criminal history score. Basurto's complaints about some of her prior convictions being just on the "wrong" side of the staleness line are undermined by the fact that she has several more convictions on the "right" side of it; she also has three arrests that did not result in conviction, and which, therefore, do not contribute to her Guidelines criminal history score. Third, in the universe of conceivable "reliable information" indicating that Basurto's criminal history category does or does not "substantially over-represent[] . . . the likelihood that [she] will commit other crimes," the fact that she has, in fact, already committed another crime -- dealing drugs while on pretrial release -- has to be pretty damning. U.S.S.G. § 4A1.3(b)(1). The Court is basing its 1-category departure almost entirely on its conclusion that a category of IV over-represents the "seriousness" of her criminal history, and not that it over-represents her likelihood of recidivism. Still, that the Court suspects that a criminal history category of IV probably accurately reflects Basurto's odds of recidivism obviously militates against further departure. Fourth and finally, both the United States and the USPO agree that a horizontal departure to category III is appropriate.

As for Basurto's other two requests, the Court will grant them for the reasons it gave at the hearing. The United States does not object to Basurto's proposed 2-level downward variance to bring her sentencing in line with what the Guidelines will soon be,[19] and the Court will so

---

[19]Although Basurto was sentencing under the Guidelines that were in effect at the time of her sentencing, see U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."), and the Court's citations to the Guidelines refer to that version, as the Court writes this Memorandum Opinion and Order, the Guidelines now in

vary.[20]  This variance leaves Basurto with a working offense level of 26 -- the actual level of 28,

minus the 2-level variance for the impending amendment -- and a criminal history category of III

-- the calculated category of IV, minus the 1-category departure for over-representation.  These

figures point to a working sentencing range of 78-97 months.  From there, the Court will vary

downward the equivalent of 5 offense levels from the working Guidelines range and impose a

sentence of 51-months imprisonment -- which sits in the middle of the 46-57 month range

applicable to an offense level of 21 and a criminal history category of III, and is also the sentence

that Basurto requests -- based on its identification of fourteen factors that place downward

pressure on the sentence under § 3553(a), and which are partially offset by nine factors placing

upward pressure on the sentence.

    First, Basurto has overcome a great deal of difficulties in her life, including a very harsh

childhood.  Her perseverance is a quality on which the Court can build as it tries to help her

transition from incarceration to law-abiding life.  Perhaps a longer period of incarceration is not

necessary if there is something on which to build once she gets out of prison.  In any case, this

quality is something that puts some downward pressure on the sentence.

---

effect incorporate the 2-level step-down amendment for drug offense.  In short, the "proposed amendment" referenced in this Memorandum Opinion and Order has since passed.

    [20]When the Guidelines are amended effective November of a given year, the question is what to do with the people being sentenced in the months leading up to November.  One approach is to grant continuances to all defendants who might be eligible, but in a busy criminal district like the District of New Mexico, that approach may not be feasible.  If the Court is confident that Congress will not intervene and that the proposed amendments will go into effect, to sentence under the current Guidelines would be to create unwarranted sentencing disparities among similarly situated criminal defendants who committed similar offenses.  Thus, to avoid such unwarranted disparities, the Court has been giving a 2-level downward variance to all defendants who would be entitled to a Guidelines offense level 2 levels lower under the proposed amendment.  See United States v. Villaba, No. CR 13-0664 JB, 2015 WL 1006306 (D.N.M. Feb. 26, 2015)(Browning, J.); United States v. Vazquez-Vazquez, No. CR 10-2380 JB, 2010 WL 4927732 (D.N.M. Nov. 4, 2010)(Browning, J.).

Second, and closely related to the great difficulties that she has overcome in her life, is her drug addiction and her resultant drug conviction.  One of her greatest difficulties -- of the many she has faced -- is drug addiction.  Here, her drug addiction is in the past; she has overcome it.  That she has defeated her drug addiction is encouraging.  Many defendants have drug problems, and it is often hard to help them to return to -- or, in some cases, begin -- a law-abiding life with a drug addiction.  Although the federal courts cannot impose incarceration on a defendant as a means of treating a drug problem, given that Basurto has already resolved the issue in her life, it may be possible to reduce incarceration and shift more of the sentence to supervised release than it would be for other defendants.  In any case, this fact places downward pressure on her sentence, although it may also exert upward pressure in other ways.

Third, while the Court has already departed on her criminal history category and refused to go all the way to the category of I that Basurto requests, the Court recognizes the near-staleness of her criminal history.  While the Court is willing to depart to category III, it concludes that further consideration of the age of her prior offenses is a topic more suitable for a variance than for an additional departure.  The age of Basurto's prior felonies nonetheless puts some downward pressure on the sentence.

Fourth, the Court is concerned that Basurto has some medical problems, and those medical problems put downward pressure on her sentence.  While the Court is confident that the BOP will be able to provide her with appropriate healthcare while in custody, it is generally better to have health issues addressed outside of prison than inside.  Also, prison time is harder on a defendant with health issues than one without them, and, thus, the Court may not need to sentence her to as heavy a sentence to effectuate the § 3553(a) goals.

Fifth, and closely related to her medical problems, is her age.  Her health problems are not getting any better and are likely to get worse.  Again, it may not be necessary to incarcerate Basurto for as long as a healthy, young person to effectuate the goals of § 3553(a).

Sixth, and closely related to her medical problems and age, any sentence of incarceration for her may represent a greater proportion of her remaining life than the same length sentence would for a defendant who is younger and healthier.  This reality puts downward pressure on the sentence.

Seventh, while the Court has a high degree of confidence in the BOP's ability to help defendants with medical problems, it remains difficult to predict with certainty whether and how the BOP will be able to assist her.  The Court has had good luck with the BOP and their medical support, so this issue is not a great factor, but this uncertainty puts downward pressure on the incarceration range.  Perhaps more supervised release would be better.

Eighth, while the seriousness of this crime is a two-edged sword in her case, it was not a violent crime and not the most serious crime that the Court has seen.  The crime is serious, but the non-violent nature of it mitigates the seriousness of the offense somewhat.  This factor puts some downward pressure on the sentence.

Ninth, none of her past crimes have been violent.  Although one of her arrests is troubling, it is difficult to work with arrests at sentencing; it is generally more appropriate to limit consideration of past criminal history to convictions.  If the Court can keep her from dealing drugs out of her house, she probably is not a threat to the community.  The Court may not need lengthy incarceration to protect the public if it can deal with the drug dealing out of her home -- which the Court will do by imposing a fine that may dispossess her of her home, or, if she decided to keep the house, never risk it again with drug dealing.

Tenth, the goal to not impose a sentence that is greater than necessary to achieve the goals of § 3553(a) of the Sentencing Reform Act always puts downward pressure on the Guidelines range.  It does in this case, too.

Eleventh, the Court may be able, in Basurto's case, to trade some supervised release for incarceration.  This factor puts only weak downward pressure on the sentence, however, because, in the end, her performance on pretrial release puts upward pressure on the sentence. Nevertheless, it is desirable, when possible, to use supervised release rather than lengthy incarceration.

Twelfth, Basurto will be a more vulnerable inmate than other defendants, because of her health.  In particular, her ability -- or inability -- to move may make her vulnerability ever more acute than most defendants, even those with severe health problems.  Again, this reality puts downward pressure on the sentence, because her incarceration may be more difficult than for most defendants with a similar sentence.

Thirteenth, Basurto cares for her father and mother.  They too have some serious health conditions.  She also cares for her grandchildren.  The impact of a lengthy sentence on them puts downward pressure on the Guidelines range.  She will worry about her parents and suffer more because of them.

Fourteenth, while the Court makes much of her performance on pretrial release in other areas of crafting an appropriate sentence for Basurto, it recognizes that the quantity of drugs she sold on pretrial release was small.  Although her crime while on pretrial release places upward pressure in other areas of the sentencing, the small amount -- 1.1 grams -- puts downward pressure on the sentence.  A separate factor -- perhaps a fifteenth -- that is closely related to the fourteenth factor, is that Basurto appears to be a street-level, retail dealer, and not a wholesale

dealer.  There are different levels of drug trafficking.  If the Court can keep her from dealing drugs out of her house in Grants, longer incarceration may not be necessary.  The low-level nature of her drug activity puts downward pressure on the sentence.

The Court has also, however, identified nine factors that put upward pressure on the sentence.  First, the sentence must reflect the seriousness of the crime.  See 18 U.S.C. § 3553(a)(2)(A).  While the Court has noted a number of mitigating factors about her crime, it remains a serious one.  Heroin and cocaine are a major problem in the smaller towns of northern New Mexico.  The sentence must not understate the seriousness of this crime and the threat it presents, especially in the aggregate, to New Mexico's communities.  See United States v. Valdez, No. CR 13-0559-2 JB, 2014 WL 7473803, at *28 n.16 (D.N.M. Dec. 15, 2014) (Browning, J.).

Second, the sentence must promote respect for the law.  See 18 U.S.C. § 3553(a)(2)(A).  If the Court varies too much, it sends a message to Grants and other communities that the federal courts no longer take drug offenses seriously.  This factor puts upward pressure on the sentence.

Third, the sentence must provide a just punishment.  See 18 U.S.C. § 3553(a)(2)(A).  While this factor often falls on the mitigating or downward-pressure side of the ledger, in Basurto's case, it remains on the upward-pressure side.  The Court cannot vary so much that the parties and the public no longer see the punishment as just, but just a slap on the wrist.

Fourth, the sentence must provide adequate deterrence.  See 18 U.S.C. § 3553(a)(2)(B).  This factor is a very important one in the sentencing calculus in this case.  At a general level, the sentence should not vary so much that no one will fear the punishment for dealing drugs out of houses in small towns in rural New Mexico.  See Editorial, Go for Root of Drug Problem, Albuquerque J., July 27, 2015, http://www.abqjournal.com/618487/opinion/go-for-root-of-drug-

problem.html.  On a specific level, Basurto has not shown an inclination to quit dealing drugs out of her home.  The sentence must be a serious attempt to get her to stop her illegal actions.

Fifth, the Court's sentence must protect the public.  See 18 U.S.C. § 3553(a)(2)(C). While her crime was not violent, it is a serious crime that plagues small communities in New Mexico.  The Court must do its part to help with the drug problem, and this factor puts upward pressure on the sentence.

Sixth, the Court's sentence should avoid creating unwarranted sentencing disparities among similarly situated defendants who have been convicted of similar crimes.  See 18 U.S.C. § 3553(a)(6).  While the Court ultimately concludes that a variance is warranted, it should vary carefully.  Many other defendants dealing drugs in New Mexico have similar criminal records to Basurto's, and the Court should not undermine the desire for uniformity among those defendants.

Seventh, while the Court can theoretically use supervised release as a substitute for some incarceration, the Court is not confident that Basurto will be successful on supervised release. Most people behave on pretrial release, right before they see the judge for sentencing; Basurto did not.  Her poor performance on pretrial release puts upward pressure on the sentence.

Eighth, while the Court has identified her medical condition as a mitigating factor, her ailments have not kept her from dealing drugs out of her home in Grants.  So while her medical problems put some downward pressure on the sentence, the fact that these conditions did not inhibit past criminal behavior and are not likely to inhibit future criminality limits that downward pressure.  This reality puts upward pressure on the sentence.

Ninth, Basurto has not really accepted responsibility for her criminal activity.  While this factor is reflected in the Guidelines range by not giving her any reduction for acceptance of responsibility, and the Court does not want to keep coming back to the same factors to add

additional punishment, that she did not stop dealing drugs while on pretrial release indicates that her criminal conduct never really stopped, even during the course of this case. She is going to need to receive a severe sentence to make certain that she gets the message that she cannot continue to engage in the same sort of conduct.

The Court thus concludes that the downward factors outweigh the upward factors. The Court will vary the sentence downward by the equivalent of 5 offense levels, from 26 to 21, and will sentence her to the midpoint -- and the point that Basurto requests -- of the resultant 46-57 month range.

## II.      THE COURT WILL IMPOSE A $13,133.33 FINE.

Giving Basurto credit in the fine context for the same 2-offense level variance the Court gave her in the incarceration context, Basurto's working offense level of 26 points to a Guidelines fine range of $12,500.00 to $1,000,000.00.[21]  See U.S.S.G. § 5E1.2(c)(3).  After considering the fourteen applicable factors, see supra Law Regarding the Imposition of Criminal Fines, Part 2 (The Court Must Then Consult the Statutory Factors), the Court concludes that it should impose a fine roughly equivalent to half the value of Basurto's residence, minus her current debt.

### A.      THERE ARE GOOD REASONS FOR IMPOSING A FINE IN THIS CASE.

Most -- if not all -- drug dealers are motivated by money. They may be feeding a habit, but they are still doing it for money. If the nation wants to cut down on drug trafficking, it

---

[21]The Guidelines fine chart indicates a range of $12,500.00 to $125,000.00 when the offense level is 26-28. See U.S.S.G. § 5E1.2(c)(3). When, however, "the defendant is convicted under a statute authorizing . . . a maximum fine greater than $250,000, . . . the court may impose a fine up to the maximum authorized by the statute." U.S.S.G. § 5E1.2(c)(4). Basurto's statute of conviction, 21 U.S.C. § 841(b)(1)(C), authorizes "a fine not to exceed . . . $1,000,000 if the defendant is an individual." The Guidelines range maximum is, thus, $1,000,000.00.

should hit drug traffickers where it hurts -- by taking away their assets.  Most drug traffickers are -- to varying degrees -- supported by the proceeds of their trafficking.  They may not buy a certain house or car for the purpose of using it to deal drugs, but they often rely on these things to further their drug dealing enterprises.

After reading the PSR, the Court was inclined to impose a fine depriving Basurto of her house, or, if she wants to keep the house, make it so that she will not risk the house again with drug dealing.  She has cost the United States, the USPO, and the Court a lot of time and energy, the taxpayers a lot of money, and the citizens of Grants a lot of health, safety, and peace of mind.  Her incarceration will cost the country at least $123,028.83 when it is all said and done, and her supervised release will then soak up another $1,042.23 on top of that.  See 18 U.S.C. § 3572(a)(6) (directing district courts to consider "the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence"); U.S.S.G. § 5E1.2(d)(7) (same); PSR ¶ 88, at 21 (listing the Administrative Office of the Courts' current estimates of costs of prosecution at $2,412.33 per month while the defendant is housed in a BOP facility and $278.95 per month while he or she is on supervised release).  Furthermore, given the elaborate setup, the firearm, and the large quantities of drugs in the home, it is apparent to the Court that Basurto was running a drug operation out of her home, although the Court cannot say for sure whether it was "distribution" or mere "dealing."  PSR ¶ 17, at 7 (opining that Basurto "played a significant role in the distribution of illegal narcotics," and that the facts of her case are "not indicative of someone who is a low-level street dealer").  The Court is not enthusiastic about the prospect of Basurto getting out of prison, going on supervised release, and going right back to the same house from which she previously ran a drug-dealing operation.  She dealt drugs

from the house even while on pretrial release awaiting sentencing, and the Court is not confident in her ability to go back and refrain from dealing drugs.

The Court's fine is at the very bottom of the Guidelines range: $633.33 above the minimum, and 0.0641% of the way from the minimum to the maximum.[22]  In formulating its figure, the Court started with Basurto's "financial resources," i.e., a large asset -- her home -- that the Court knew she owned.  18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d)(2).  The Court severely downwardly revised its estimate of the home's value when presented with evidence of its value -- from the $102,356.00 figure that the USPO estimated to the $33,689.00 estimate contained in the tax-assessment documents -- and additionally halved that figure to reflect that she is only entitled to half of the proceeds from any sale of the house, with the other half going to her husband.  See PSR ¶ 74, at 18.  Last, the Court, to better reflect Basurto's true "ability to pay the fine" -- and to not fine away money that should rightfully go to her creditors -- the Court deducted $2,500.00 -- the amount Basurto has in outstanding debt -- from even that figure.  U.S.S.G. § 5E1.2(d)(2).  See PSR ¶ 74, at 19 (listing Basurto's "total liabilities" as $2,501.00).  This fine is not unreasonable, nor is it excessive.

### B.   BASURTO DID NOT PROVE, BY A PREPONDERANCE OF THE EVIDENCE, THAT SHE IS UNABLE TO PAY A FINE.

Under the Guidelines, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  U.S.S.G. § 5E1.2(a) (emphasis added).  Basurto has the burden of proving that she cannot afford to pay a fine, and she did not do so.  She has a house, and she does not seem to be willing to quit selling drugs out of it.  The facts indicate that the house was materially involved in her drug

---

[22]Even if the statute had not preempted § 5E1.2(c)(3)'s default maximum for crimes with an offense level of 26-28, the Court's fine would still be only 5.6% of the way in between the minimum and the maximum.

trafficking; because of her lack of mobility, she dealt drugs out of her home.  The house was the hub of her criminal activity, and a major "source and suppl[y] of heroin, methamphetamine, and oxycodone in Grants," which "played a significant role in the distribution of illegal narcotics." PSR ¶ 17, at 7.  Her family living there knew where she kept the drugs, and, while the Court is mindful of the hardship this fine -- if its imposition indeed necessitates the sale of Basurto's home[23] -- will cause them, the Court is not enthusiastic about the prospect of leaving the house in the hands of people who knew about the criminal activity going on in the residence but said and did nothing about it.  See PSR ¶ 14, at 6-7 ("The defendant's daughter then opened the larger safe which contained a white crystalline substance that field tested positive for methamphetamine, [and] two handbags containing U.S. currency and a Lorcin .25 caliber handgun. . . .").

It is unclear whether Basurto will even want the house after she gets out of prison.  If her health condition continues to decline, she may not be able to live in that house or any house.  Given her health and financial state, she may have to sell the house anyway.  There is no guarantee that she will be able to keep or will want to keep it.  Regardless, the Court concludes that it would be best if she did not keep the house, or, if she decides to keep it, she is reminded to

---

[23]Basurto may not even have to sell her home.  She gave the Court two valuations.  First, she told the USPO that that the home was worth $102,356.00, and that there was no mortgage lien.  Later, once the Court had already indicated its intention to fine her, she submitted a tax assessment valuing the home at $33,689.00.  Basurto has not, however, by a preponderance of the evidence, proven the value of her home.  The evidence in the record -- both of her valuations -- could suggest either amount, but she has done nothing -- such as submit affidavits, real estate market estimates, appraisals, or anything else to show the value of the home.  The Court has, for the purposes of formulating a fine, accepted Basurto's $33,689.00 tax-assessment-based valuation of her home, but if the USPO's $102,356.00 estimate is a closer approximation of the home's actual value, then Basurto will almost certainly be able to take out a mortgage to cover the fine, if she so desires.  See PSR ¶ 74, at 18.  Indeed, she may be able to take out a loan even if the home is only worth the smaller amount.

never put it at risk again by dealing drugs.  The house has caused her much trouble, and it might be too easy for her to slip back into the same habits, and keep in touch with the same customers, back in the home.

Once the Court decided that -- despite her minimal assets, the third parties living in her home, and the other factors -- it should fine her, the burden shifted to Basurto to prove she could not afford to pay that fine.  While she offered a second valuation of the home -- which the Court accepted -- other than that second valuation, she did not offer any evidence that she could not pay the proposed fine.  While the difficulty a fine will cause is certainly relevant when she is arguing that the Court should not impose a fine, it is not relevant once the Court decides to impose a fine.  At that stage, difficulty to the defendant is not the issue; the sole issue is whether she can pay the fine.  Indeed, the evidence that she has submitted supports the Court's finding, by a preponderance of the evidence, that she can pay the fine by selling her home or getting a loan equivalent to its value.

**IT IS ORDERED** that the requests in the Sentencing Memorandum and Motion for Downward Departure, filed June 18, 2014 (Doc. 57), the United States' Supplemental Briefing to the Court in Support of a Fine as Part of Defendant's Sentence, filed November 6, 2014 (Doc. 66), and Ms. Basurto's Supplemental Brief in Opposition to Imposition of a Fine, filed March 24, 2015 (Doc. 70), are each granted in part and denied in part.  The Court sentences Defendant Rachel Basurto to 51-months imprisonment to be followed by 3 years of supervised release, a $13,133.33 fine, and $200.00 in special assessments.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
  United States Attorney
Linda Mott
Lynn Wei-Yu Wang
  Assistant United States Attorneys
United States Attorney's Office for the District of New Mexico
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Stephen P. McCue
  Federal Public Defender
John Van Butcher
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

     *Attorneys for the Defendant*